# Illinois Official Reports

## Appellate Court

---

### *People v. Taylor*, 2013 IL App (1st) 110166

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAMIREZ D. TAYLOR, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-0166 |
| Filed<br>Rehearing denied | December 18, 2013<br>January 13, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court upheld defendant's conviction for aggravated unlawful use of a weapon under section 24-1.6(a)(1), (a)(3)(C) of the Criminal Code, based on carrying a firearm without a valid FOID card, as elevated to a Class X felony as a result of wearing body armor, since evidence pertaining to the narcotics found on codefendants at the time of defendant's arrest was relevant to explain the arresting officer's conduct leading up to defendant's arrest and why defendant was armed and fled, and any error was harmless in view of the overwhelming evidence of defendant's guilt, defense counsel was not ineffective in failing to object to an officer's testimony about the bulletproof vest defendant was wearing, even though the officer was not an expert, and furthermore, neither prong of the *Strickland* test was established, and the constitutionality of subsection (a)(3)(C) was upheld despite *Aguilar*, because subsection (a)(3)(C) is not a flat ban but, rather, is intended to protect the public from persons who should not be permitted to carry firearms. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-C-661030; the Hon. Frank Zelezinski, Judge, presiding. |

| Judgment | Affirmed. |
|---|---|
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Karl H. Mundt, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and William L. Toffenetti, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion. Presiding Justice Hyman and Justice Mason concurred in the judgment and opinion. |

## OPINION

¶ 1    Following a jury trial, the defendant, Ramirez D. Taylor, was found guilty of aggravated unlawful use of a weapon (AUUW) under section 24-1.6(a)(1), (a)(3)(C) of the Criminal Code of 1961 (Code) (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2006)) for carrying a firearm without a valid Firearm Owner's Identification (FOID) card. His offense was elevated to a Class X felony because he wore body armor as described in section 33F-1(a)(2) of the Code (720 ILCS 5/33F-1(a)(2) (West 2006)). 720 ILCS 5/24-1.6(d) (West 2006). The defendant was then sentenced to 16 years' imprisonment. On appeal, he contends that: (1) the trial court erred in admitting narcotics evidence found on codefendants at the time of his arrest; (2) trial counsel was ineffective for failing to object to the admission of hearsay evidence pertaining to the body armor; (3) without the improper body armor evidence, there was insufficient evidence to prove the aggravating element which made his offense a Class X felony; and (4) the AUUW statute is facially unconstitutional because it violates the second amendment (U.S. Const., amend. II). For the reasons that follow, we affirm.

¶ 2    The defendant was charged with multiple counts of AUUW after being arrested while fleeing a vehicle with a handgun on September 15, 2006. The other vehicle occupants were arrested for possessing narcotics. Prior to trial, the defendant filed a motion seeking, *inter alia*, to bar the State from introducing any evidence of narcotics found near the vehicle at the time of his arrest. In opposition, the State argued that the evidence was relevant to show the circumstances of the defendant's arrest. The State explained that cocaine was dropped out of the driver's window as the defendant fled the vehicle with a gun; cannabis was later recovered from the inside of the vehicle. According to the State, the narcotics evidence explained the police officers' course of conduct as one officer stayed with the vehicle while two other

officers chased the defendant. The trial court allowed the State to introduce the narcotics evidence for the purpose of explaining the circumstances of the defendant's arrest. The court limited the evidence by stating that the prosecution "will clearly indicate that the defendant [was] not charged with [the narcotics]." The court further stated that neither party could comment on the dispositions of the codefendants' narcotics cases.

¶ 3 On September 29, 2010, the State proceeded to trial on count II of the indictment, which charged the defendant with AUUW under section 24-1.6(a)(1), (a)(3)(C) (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2006)). Officer Tony DeBois testified that he was the director of special operations for the Harvey police department. On September 15, 2006, around 9:50 p.m., he was working with tactical officers Harlen Lewis and Leonard Weathers in an unmarked car. Officer DeBois drove the car while Officer Lewis sat in the front passenger seat and Officer Weathers sat in the rear. He stated that he was headed southbound on Winchester Street in Harvey when a green Buick LeSabre attempted to turn in front of him and almost struck his vehicle. He testified that he then activated his emergency lights and followed the Buick, which turned into a driveway at 14388 South Winchester. According to Officer DeBois, the officers pulled up right behind the Buick, at which point the rear door of the Buick opened and the defendant got out and ran away from the car. Officers Lewis and Weathers ran after the defendant; Officer DeBois remained with the Buick and called for backup because he observed the driver throw a plastic bag out of his window.

¶ 4 When the backup officers arrived, Officer DeBois approached the Buick and retrieved the plastic bag, which contained a white substance, later determined to be cocaine. He then requested that the other individuals exit the Buick, and he searched the vehicle, retrieving a green leafy substance which was later proved to be cannabis. Officer DeBois testified that the driver of the Buick, Whalen Hughes, and the passenger, Jemetric Nickelson, were later taken to the police station.

¶ 5 Officer DeBois stated that after a short time, Officers Lewis and Weathers returned to the Buick with the defendant and showed him a loaded handgun that they had recovered from the defendant. Officer DeBois described the gun as a black Glock 19 with an extended ammunition clip. Officer Lewis also lifted the defendant's sweatshirt and showed Officer DeBois the bulletproof vest that the defendant was wearing. The State then introduced photographs from the scene depicting the defendant wearing the vest while standing next to Officer Lewis.

¶ 6 The following day, Officer DeBois, along with Officers Steve Pryor and Robert Hunt, interviewed the defendant. Officer DeBois testified that the defendant stated that he had purchased the Glock 19 several days earlier for $300 from a man named Lonnie "Pen" Cooksey. According to Officer DeBois, they did not reduce the defendant's statement to writing and did not videotape it because the defendant refused.

¶ 7 Officer Harlen Lewis testified that when he and Officers DeBois and Weathers pulled up behind the Buick, he saw the defendant jump out of the back of the car. According to Officer Lewis, the defendant had what appeared to be a black gun in his hand as he ran. He stated that he began chasing the defendant, identifying himself as a police officer, and ordering him to stop and drop his weapon. He testified that, while he was in plain clothes, he wore his badge either around his neck or on his belt so that it was visible. His vest also had "police" written on

the back. Officer Lewis caught up with the defendant after about 1 1/2 blocks, forcibly subdued him, and took his gun. The gun was later identified as the Glock 19, and according to Officer Lewis's testimony, it was loaded with about 19 rounds of ammunition.

¶ 8 Officer Lewis testified that after he subdued the defendant, he conducted a pat-down search and felt something hard and stiff under his sweatshirt. He lifted the shirt and determined that the defendant was wearing a ballistics vest, which he indicated was the same type police officers wear for protection. The State then introduced People's Exhibit No. 5, which Officer Lewis identified as a bulletproof vest. He briefly described the vest and the different ways it can be worn. The State then proffered the back panel of the vest, which was marked as People's Exhibit No. 5A. Over a defense objection based on relevance, Officer Lewis identified the front and back panels of the vest as ballistic material. Officer Lewis then read the "material" label from the vest as "a hundred percent Kevlar." He testified that Kevlar is a type of ballistic material. He identified a pouch in the front of the panel as a "shock plate," which protects an officer's sternum if he is shot. Officer Lewis also stated that the defendant's vest had "soft" Kevlar inserts and that some types of vests have metal inserts.

¶ 9 Officer Steven Pryor testified that he conducted a search to determine whether the defendant had a valid FOID card, which he did not.

¶ 10 The defendant moved for a directed verdict, arguing that the State failed to prove that the defendant's vest was made of the Kevlar material. The defendant argued that Officer Lewis, who read the Kevlar tag, did not testify that the vest identified in court was the vest that the defendant was wearing at the time of his arrest. The trial court denied the motion. The court admitted into evidence the gun and ammunition, the bulletproof vest, the photos of the defendant wearing the vest, and the narcotics evidence retrieved from the scene. The narcotics and ammunition evidence were not sent back to the jury room; the remaining evidence, including the vest, however, was sent to the jury. The jury returned a guilty verdict, and later, the trial court sentenced the defendant to prison for 16 years.

¶ 11 The defendant first argues that he was denied a fair trial by the admission of the irrelevant and prejudicial narcotics evidence found on Hughes and Nickelson at the time of his arrest. He maintains that the narcotics evidence was not relevant to his AUUW charge and was therefore highly prejudicial as it placed him in a car with two people possessing narcotics. We disagree.

¶ 12 We will not disturb the trial court's decision regarding the admission of evidence at trial absent a clear abuse of discretion. *People v. Robinson*, 217 Ill. 2d 43, 62 (2005). The abuse-of-discretion standard is the most deferential standard of review, and a trial court abuses its discretion only when its ruling is arbitrary, fanciful or unreasonable or where no reasonable man would take the view adopted by the trial court. *People v. Anderson*, 367 Ill. App. 3d 653, 664 (2006).

¶ 13 " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011); see also *People v. Blue*, 189 Ill. 2d 99, 122 (2000). Relevant evidence should be admitted unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless

presentation of cumulative evidence." Ill. R. Evid. R. 403 (eff. Jan. 1, 2011); see also *Blue*, 189 Ill. 2d at 122.

¶ 14    In this case, the trial court determined, and we agree, that the narcotics evidence was relevant to explain the police officers' course of conduct in the investigation leading up to the defendant's arrest. The evidence was also relevant in that it tended to explain why the defendant was armed and fled the vehicle. See *People v. Stone*, 244 Ill. App. 3d 881, 892 (1993) (finding evidence of guns, drugs and ammunition, which did not form basis of charges against the defendants, was admissible because it tended to show the defendants' knowledge of the contraband in the vehicle and why they fled); *People v. Batinich*, 196 Ill. App. 3d 1078, 1083 (1990) ("It has also been held that evidence suggesting other criminal activity is admissible where the evidence is relevant to explain the circumstances of a defendant's arrest [citation] and the arresting officer's reasons for commencing surveillance [citation].").

¶ 15    We also agree that the evidence's probative value was not outweighed by its potentially prejudicial nature. The trial court limited the introduction of the narcotics evidence to explain why one officer remained at the vehicle and two others ran after the defendant. Officer Debois testified that he found the narcotics around the vehicle from which the defendant just fled and thereafter transported Hughes and Nickelson to the police station. In compliance with the trial court's limiting order regarding the evidence, the defendant was never implicated in the possession of the narcotics and the jury was not told about the disposition of the charges against Hughes and Nickelson.

¶ 16    Furthermore, even if the admission of the narcotics evidence was error, that error would have been harmless given the overwhelming other evidence of the defendant's guilt of the AUUW offense. See *People v. Pulliam*, 176 Ill. 2d 261, 275 (1997) (stating that error does not require reversal where it is harmless and an evidentiary error is harmless if properly admitted evidence is so overwhelming that no fair-minded juror could reasonably have voted to acquit the defendant). Excluding the narcotics evidence, the remaining evidence, including Officer Lewis's testimony that he saw the defendant flee with a gun, the retrieval of the gun, ammunition and vest from the defendant's person, and the defendant's admissions to Officer DeBois, was so overwhelming that no jury could reasonably have voted to acquit the defendant.

¶ 17    Next, the defendant argues that his trial counsel was ineffective for failing to object to Officer Lewis's testimony regarding the bulletproof vest. He argues that Officer Lewis was not qualified as an expert on Kevlar material and his reading of the vest's label was inadmissible hearsay. The defendant argues that, had the evidence been properly excluded, the remaining evidence was insufficient to prove the aggravating body-armor element which made his offense a Class X felony. We disagree.

¶ 18    A claim of ineffective assistance of counsel is evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11. Under this test, a defendant must demonstrate that (1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness; and (2) he was prejudiced, meaning that a reasonable probability exists that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A defendant's failure to establish either

prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Id.* In this case, the defendant fails to establish that counsel's performance was deficient.

¶ 19     In a case published after the parties in this case filed their briefs, the appellate court in the Second District addressed arguments identical to the ones the defendant makes here. In *People v. Richardson*, 2013 IL App (2d) 120119, ¶ 9, the defendant was charged with unlawfully possessing a weapon as a felon while wearing body armor of the type described in section 33F-1(a)(2) of the Code. Section 33F-1(a)(2) of the Code defines body armor as "[s]oft body armor which is made of Kevlar or any other similar material or metal or any other type of insert and which is lightweight and pliable and which can be easily concealed under a shirt." 720 ILCS 5/33F-1(a)(2) (West 2006).

¶ 20     The defendant in *Richardson* argued on appeal that the trial court erred by allowing the police officer to testify to his lay opinion that the vest constituted "soft body armor" and by allowing the prosecutor to read the label on the vest during closing argument; the label stated that the vest was made by "American Body Armor." *Richardson*, 2013 IL App (2d) 120119, ¶ 6. The appellate court rejected the defendant's argument, noting that a lay witness opinion is admissible "where the facts could not otherwise be adequately described to the fact finder so as to allow the fact finder to reach an intelligent conclusion." *Id.* ¶ 10. The court further noted that a lay witness may express an opinion on an issue if that opinion will assist the trier of fact. *Id.* The lay witness's opinion is admissible so long as it is based on the witness's personal observations, is of the type the person is generally capable of making, and is helpful to a clear understanding of an issue in the case. *Id.*; see also Ill. R. Evid. 701 (eff. Jan. 1, 2011) (codifying these general principles of law regarding lay witness opinions). The court stated that the police officer testified that the defendant's vest was similar to the type that he wore in his job and explained why he thought the vest was body armor. *Richardson*, 2013 IL App (2d) 120119, ¶ 19. The court noted that the officer's opinion was not inadmissible merely because it dealt with an ultimate factual issue to be decided by the jury. *Id.* (quoting Ill. R. Evid. 704 (eff. Jan. 1, 2011)).

¶ 21     Finally, the court rejected the defendant's argument that scientific evidence was necessary to prove that the body armor contained Kevlar rather than some inferior or "fake body armor" material, finding the argument speculative. *Id.* ¶ 20. The court stated that the vest was admitted into evidence and the jury was allowed to draw its own conclusion as to whether the vest constituted body armor. *Id.* Further, the court found that no specialized knowledge was required for an opinion that the defendant wore body armor because "even an average person knows what a bulletproof vest is." *Id.* ¶ 22.

¶ 22     We agree with the analysis in *Richardson* and find that Officer Lewis's testimony regarding the vest was properly admitted as his lay opinion. Officer Lewis's opinion was based on his personal observations and was of the type he was generally capable of making. Additionally, his opinion assisted the fact finder in a clear understanding of the issue. Officer Lewis testified that he observed the vest, was familiar with bulletproof vests as part of his employment, and believed that the defendant's vest was made of a ballistic material. He explained the various parts of the vest, including the cover and the ballistic panels and insert. He also observed the Kevlar label. The fact that Officer Lewis read the vest's label was

irrelevant because the vest was properly admitted into evidence and the label could be read by the members of the jury.

¶ 23     We also agree with *Richardson*'s determination that no specialized knowledge is required for an opinion as to whether the defendant's vest constituted body armor under section 33F-1 of the Code as it is written. The statute broadly states, in relevant part, that the vest constitutes "body armor" if it is made of Kevlar or *any* other similar material. 720 ILCS 5/33F-1(a)(2) (West 2006). Thus, the State did not have to present scientific evidence that the vest was made of a specific type of material, such as Kevlar; rather, the State needed only to present evidence that the vest was made of any material similar to Kevlar. Because Officer Lewis's testimony was admissible, counsel's failure to object to it was not error. Therefore, the defendant's ineffective-assistance-of-counsel claim fails.

¶ 24     The defendant also argues that, without Officer Lewis's testimony pertaining to the body armor, the remaining evidence is insufficient to prove the aggravating element that elevated his offense to a Class X felony. Because we conclude that Officer Lewis's testimony was admissible, the defendant's argument on this point is without merit.

¶ 25     Finally, the defendant argues that his AUUW conviction must be reversed because the statute is facially unconstitutional in that it violates the second amendment of the United States Constitution (U.S. Const., amend. II). Though this issue was not raised in the trial court, a constitutional challenge may be raised at any time. *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 23. Whether a statute is constitutional is a question of law to be reviewed *de novo*. *Id.*

¶ 26     Section 24-1.6 of the Criminal Code of 1961 (Code) provides:

> "(a) A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly:
>
> > (1) Carries on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land or in his or her land or in his or her abode or fixed place of business any pistol, revolver, stun gun or taser or other firearm [and]
> > ***
> > (3) One of the following factors is present:
> > > * * *
> > > (C) the person possessing the firearm has not been issued a currently valid Firearm Owner's Identification Card." 720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2006).

¶ 27     In *People v. Aguilar*, 2013 IL 112116, ¶ 22, the supreme court adopted the reasoning in *Moore v. Madigan*, 702 F.3d 933, 941-42 (7th Cir. 2012), which held that section 24-1.6(a)(1), (a)(3)(A) of the Code was a flat ban on carrying guns outside the home and that such a ban violated the right to bear arms under the second amendment. *Aguilar*, 2013 IL 112116, ¶ 20. Our supreme court stated that the United States Supreme Court has held that the central component of the right to keep and bear arms is individual self-defense and that restricting that right to the home makes little sense as confrontations are not limited to the home. *Id.* (citing

*District of Columbia v. Heller*, 554 U.S. 570, 599 (2008)). The supreme court stated that, while the second amendment protects the right to possess and use a firearm for self-defense outside the home, it was not concluding that "such a right is unlimited or is not subject to meaningful regulation." *Id.* ¶ 21. However, the court concluded that this section of the AUUW statute was not a reasonable regulation, but a "wholesale statutory ban on the exercise of a personal right that is specifically" guaranteed by the United States Constitution. *Id.* The supreme court, therefore, reversed the defendant's AUUW conviction under section 24-1.6(a)(1), (a)(3)(A) as the statute was facially unconstitutional. *Id.* ¶ 22.

¶ 28    In this case, however, the defendant was convicted under a different section of the AUUW statute. Section 24-1.6(a)(1), (a)(3)(C) of the Code provides that a person commits the offense of aggravated unlawful use of a weapon when he carries a firearm without a FOID card, and this section was not addressed in *Aguilar*. Unlike the comprehensive ban in section 24-1.6(a)(1), (a)(3)(A) at issue in *Aguilar*, section 24-1.6(a)(1), (a)(3)(C) is not a comprehensive ban on possessing and carrying firearms for self-defense outside of the home. Rather, this section affects only a certain class of people, namely, those lacking a FOID card. Our supreme court has acknowledged that certain classes of people, including felons and the mentally ill, may be disqualified from the exercise of second amendment rights. See *Aguilar*, 2013 IL 112116, ¶ 26 (citing *Heller*, 554 U.S. at 626-27). In fact, our supreme court upheld a similar unlawful possession of a firearm statute which prohibited a class of people (minors) from possessing a firearm (720 ILCS 5/24-3.1(a)(1) (West 2008)). *Aguilar*, 2013 IL 112116, ¶ 27. Even *Moore*, upon which the *Aguilar* court relied, acknowledged that there are reasonable restrictions on the right to bear and keep firearms, including prohibiting children from possessing them or requiring gun owners to obtain permits. *Moore*, 702 F.3d at 940-41; see also *Heller*, 554 U.S. at 635 (stating "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home," indicating that there may be valid restrictions on issuing a firearm license); *Drake v. Filko*, 724 F.3d 426, 440 (3d Cir. 2013) (upholding New Jersey's handgun law requiring permits, finding it did not violate the second amendment right to bear arms).

¶ 29    Statutes are presumed constitutional, and we have a duty to construe the statute in a manner that upholds the statute's validity and constitutionality, if it can be reasonably done. *Aguilar*, 2013 IL 112116, ¶ 15. Courts have been inconsistent in the level of scrutiny to apply to laws that place restrictions on an individual's second amendment right to bear arms. Courts have applied intermediate scrutiny (*People v. Alvarado*, 2011 IL App (1st) 082957, ¶ 58), strict scrutiny (*Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011)), and, most recently, a "text, history, and tradition" analysis (*Gowder v. City of Chicago*, 923 F. Supp. 2d 1110, 1120 (N.D. Ill. 2012)). Regardless of the approach applied, we find this section of the AUUW statute survives.

¶ 30    Under the strict scrutiny standard, the means employed by the legislature must be necessary to achieve a compelling state interest, and the statute must be narrowly tailored to accomplish this goal, meaning the legislature must employ the least restrictive means consistent with the attainment of the intended goal. *People v. Cornelius*, 213 Ill. 2d 178, 204

(2004). The portion of the AUUW statute at issue here seeks to protect the public from individuals carrying firearms who should not be permitted to do so (see 430 ILCS 65/1 (West 2012) (stating public safety purposes of FOID law)). Requiring individuals to comply with the FOID card statute is the least restrictive way in which to meet this compelling state interest. Therefore, section 24-1.6(a)(1), (a)(3)(A) of the Code survives under strict scrutiny analysis.

¶ 31　　The "text, history, and tradition" approach is the result of the United States Supreme Court's decisions in *Heller*, 554 U.S. at 628-29, and *McDonald v. City of Chicago*, 561 U.S. ___, ___, 130 S. Ct. 3020, 3058 (2010). Under this analysis, the court assesses whether a firearms law regulates activity falling outside the scope of the second amendment right as it was understood at the time of the amendment's adoption. *Gowder v. City of Chicago*, 923 F. Supp. 2d 1110, 1120 (N.D. Ill. 2012) (citing, in relevant part, *Heller*, 554 U.S. at 576, and applying "text, history, and tradition" approach in determination that Chicago gun ordinance was unconstitutional). In *Moore*, 702 F.3d at 940, the Seventh Circuit acknowledged that a state law restricting an individual's second amendment right to bear arms may "prevail *** when *** guns are forbidden to a class of persons who present a higher than average risk of misusing a gun." Section 24-1.6(a)(1), (a)(3)(A) is such a law; this statute seeks to prevent persons who fail to obtain a FOID card, which is the state's method to prevent those who present a higher than average risk of misusing a gun, such as minors, felons, or the mentally ill, from legally carrying one in public places. Accordingly, under the "text, history, and tradition" approach, section 24-1.6(a)(1), (a)(3)(A) of the Code survives the defendant's constitutional attack.

¶ 32　　Because the restriction in section 24-1.6(a)(1), (a)(3)(C) is limited to those lacking a FOID card and is not a flat ban, we decline to extend the holding of *Aguilar* to this section of the AUUW statute. Moreover, under either strict scrutiny analysis or the more recently used "text, history, and tradition" approach, this section of the AUUW statute does not violate the right to bear arms guaranteed under the second amendment. We, therefore, find that section 24-1.6(a)(1), (a)(3)(C) is not facially unconstitutional.

¶ 33　　Based on the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 34　　Affirmed.