# Illinois Official Reports

## Appellate Court

---

**People v. Wiggins, 2016 IL App (1st) 153163**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PETER WIGGINS, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-15-3163 |
| Filed | December 8, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-C6-60044; the Hon. Michele Pitman, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Andrew S. Gable, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Gina DiVito, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Justices McBride and Howse concurred in the judgment and opinion. |

**OPINION**

¶ 1   Generally, under Illinois law, an Illinois resident must possess a Firearm Owner's Identification (FOID) card to possess a firearm in Illinois. A non-Illinois resident may be exempt from the FOID card requirement, and thus may possess a firearm in Illinois, if, among other reasons, that person is "licensed" to carry that firearm in that person's home state. The first question in this appeal is whether a non-Illinois resident, whose home state allows him to possess a firearm without requiring him to first obtain a license, is deemed "licensed" in that other state for the purposes of the Illinois FOID card exemption. We hold that he is not. The second question is whether this result violates the second amendment to the United States Constitution, as applied to this individual. We hold that it does not.

¶ 2   Defendant Peter Wiggins was seen in possession of a handgun outside a bar in Chicago Heights. After police searched his car, they found a handgun inside. The State charged defendant with two counts of aggravated unlawful use of a weapon (AUUW) predicated on his lacking a FOID card—one for carrying the gun on his person without a FOID card, and one for possessing the gun in his car without a FOID card. 720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2012). After a bench trial, defendant was convicted of both counts.[1]

¶ 3   Wiggins, an army veteran and a resident of Texas, had a permit to possess the gun issued by the Fort Bliss Provost Marshal's Office and was authorized to possess his firearm in Texas. He argues on appeal that he thus qualified for an exception to the AUUW statute's FOID card requirement as a "[n]onresident" who is "currently licensed *** to possess a firearm in [his] resident state." See 430 ILCS 65/2(b)(10) (West 2012). He further argues that, if he does not fit within this exception to the FOID card requirement, the statute under which he was convicted violated the second amendment to the United States Constitution.

¶ 4   We affirm defendant's AUUW convictions. Even though the state of Texas did authorize defendant to possess a firearm in Texas, it did not first require a licensure procedure and issue him a license to do. Thus, he was not "licensed *** to possess" that firearm in Texas. *Id.* Nor does defendant's military permit qualify him for that exemption. Defendant thus cannot fit within this exception to the FOID card requirement. His convictions for possession of a firearm without a FOID card therefore stand.

¶ 5   We further find that the FOID card requirement incorporated into the AUUW statute under which defendant was convicted is a reasonable regulatory requirement that did not violate the second amendment. We thus affirm defendant's convictions in all respects.

## I. BACKGROUND

¶ 7   Noel Tenayuca testified that, around 4 a.m. on November 15, 2012, he was at a bar in Chicago Heights. He stepped outside with a friend who was smoking and saw defendant walking back into the bar. Tenayuca said that, earlier, there had been a disagreement inside the bar, and defendant seemed "a little upset." Tenayuca said that, as defendant went in, he lifted his shirt, revealing a gun with a brown handle. Tenayuca thought it was the handle of the gun

_____

[1]The acts at issue in this case occurred on November 15, 2012, several months before the Illinois General Assembly first allowed the issuance of concealed-carry permits in the Firearm Concealed Carry Act (430 ILCS 66/1 *et seq.* (West 2014)), which became effective July 9, 2013. This ruling does not involve or affect any interpretation of that later-enacted law.

and told a bouncer or bartender that defendant had a gun. Tenayuca admitted that he only "vaguely remember[ed]" any of the events of that night.

¶ 8    Officer Benjamin Hofrichter, a Chicago Heights police officer, testified that he went to the bar after receiving a call about a man with a gun. When he pulled up, he saw defendant either getting into or out of a black SUV with Texas plates. Defendant shut the door to the car when Hofrichter pulled up. Hofrichter testified that defendant knelt and raised his hands in the air, and people outside the bar said that defendant was the person with the gun. Hofrichter patted defendant down and asked defendant if he had a gun. Defendant said he did not.

¶ 9    Hofrichter asked defendant for permission to search his car, and defendant said that, if Hofrichter could get into the car, he could search it. One of the bouncers at the bar loaned Hofrichter a "lockout kit" because he also worked as a tow truck driver. Hofrichter used the lockout kit to unlock defendant's car.

¶ 10    Hofrichter put his hand down on the driver's seat, which had a seat cover over it. He felt a hard object underneath the cover and discovered that it was a loaded, .45-caliber semiautomatic handgun with brown wooden grips. Hofrichter arrested defendant and later learned that the black SUV was registered to him. Defendant had a Texas driver's license on him.

¶ 11    The State played a video from the exterior surveillance cameras at the bar during trial, although that video is not contained in the record on appeal.

¶ 12    The State also introduced a certified record from the Illinois State Police showing that defendant had never been issued a FOID card. The State then rested.

¶ 13    Defendant moved for a directed finding, arguing that the evidence showed that defendant was a Texas resident, that Texas allowed him to possess a weapon without a permit, and thus he was a licensed nonresident exempt from the FOID card requirement. The court denied the motion.

¶ 14    Defendant testified that he was in the army reserves from 2007 to 2014 and was stationed at Fort Bliss, Texas. At the time of his arrest, he was inactive. Defendant testified that, on November 15, 2012, he was a resident of Texas but was visiting family in Chicago Heights. Defendant said that he had purchased the gun found in his car at the army base at Fort Bliss. Defendant identified the permit that he obtained to purchase the gun on the base.

¶ 15    On cross-examination, defendant testified that, if he had gone to another post, he would have had to register his firearms at that new post. Defendant acknowledged that the United States Army had issued the permit, not the state of Texas.

¶ 16    The permit was labeled, "FT BLISS WEAPON PERMIT" and indicated that it had been issued by the Fort Bliss "Provost Marshals Office." It was valid from May 25, 2011, the date it had been issued, until May 25, 2014. The permit listed two firearms, including a .45-caliber pistol that defendant identified as the gun he had in his car on November 15, 2012.

¶ 17    In his closing argument, defense counsel argued that "a valid permit or license from another state can substitute for the FOID card requirement" and, because defendant had a valid permit to carry a gun in Texas, he could not be found guilty of AUUW based on his lack of a FOID card. The State responded that defendant's military permit did not absolve him of liability because it was not issued by a state: "Provost marshal is not a state. It is part of the United States Army, which is not a state."

¶ 18    The court found defendant guilty of both counts of AUUW, noting that the military permit was "not a [FOID] card or the equivalent of it from the State of Texas."

¶ 19    Defendant filed a posttrial motion arguing that he was not guilty of AUUW because of his military permit. He noted that Texas does not issue permits that are equivalent to FOID cards and that only Illinois residents may apply for FOID cards. The State responded, "Just because Texas doesn't require a permit to own a weapon does not mean that that absolves a Texas resident from the FOID requirements in the state of Illinois."

¶ 20    The court denied defendant's motion, making the following findings:

"[Defendant] had—I don't have the document in front of me, but the exhibit that I was tendered was based upon him being authorized to carry a firearm while he was either owe [*sic*] a post or something to do with the national guard with regards to him being in the national guard. It is not a license to carry a firearm in any other state. It is not a license to possess a firearm. It indicates that he can carry it in his duties with regards to being in the national guard.

***

So, counsel, I respect your argument, but he could not carry that weapon in Illinois."

¶ 21    The court sentenced defendant to 30 months' felony probation. Defendant filed this appeal.

¶ 22                II. ANALYSIS

¶ 23    On appeal, defendant raises two challenges to his convictions. First, he claims that the State could not prove him guilty of AUUW beyond a reasonable doubt because he was allowed to carry a firearm in the state of Texas and via his military permit, each of which absolves him of the necessity to obtain a FOID card in Illinois. Second, he claims that the AUUW statute, both on its face and as applied to him, violated his right to bear arms under the second amendment. We first address defendant's sufficiency-of-the-evidence argument, then turn to his constitutional claims.

¶ 24              A. Nonresident Exception

¶ 25    Defendant was convicted of two counts of AUUW. Count II of the information charged defendant with possessing a weapon in his car without a FOID card. In Count V, the State charged defendant with carrying the firearm on his person while not possessing a FOID card. Relevant to this case, a person commits AUUW when he or she knowingly "[c]arries on or about his or her person or in any vehicle or concealed on or about his or her person *** any pistol, revolver, stun gun or taser or other firearm" and "the person possessing the firearm has not been issued a currently valid [FOID] Card." 720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2012).

¶ 26    Defendant takes issue with the second of the two elements. He admits that he did not have a currently valid FOID card but claims that he was not required to obtain one. He relies on an exemption in the Firearm Owners Identification Card Act (FOID Card Act) for "[n]onresidents who are currently licensed or registered to possess a firearm in their resident state." 430 ILCS 65/2(b)(10) (West 2012). Defendant is a resident of Texas, which authorizes him to possess a weapon without obtaining a license. See Tex. Penal Code Ann. § 46.02(a) (West 2012). He also obtained a permit to possess a firearm while serving in the United States Army Reserves in

- 4 -

Fort Bliss, Texas. According to defendant, because Texas authorized him to possess the firearm in question and the Fort Bliss permit authorized him to do so, he was "licensed" to possess the firearm both at Fort Bliss and in Texas.[2]

¶ 27　　Defendant is correct that, if he fits within the FOID Card Act exemption for nonresidents who are "currently licensed *** to possess a firearm in their resident state," then he cannot be prosecuted for AUUW based on his lack of a FOID card. In *People v. Holmes*, 241 Ill. 2d 509, 521 (2011), the Illinois Supreme Court held that section 2(b)(10) of the FOID Card Act functions as an exception to liability under the AUUW statute. The AUUW statute's prohibition on possessing a firearm without a FOID card must be read in conjunction with the FOID Card Act, so if a defendant qualified for an exemption from the FOID Card Act, that defendant likewise could be not be convicted under that provision of the AUUW statute. *Id.* Simply put, if a nonresident is "licensed" to possess the firearm in his resident state, he cannot be convicted under the AUUW for possession of a firearm without a FOID card. *Id.*

¶ 28　　This raises a question of statutory construction, whether defendant was "licensed" to possess his firearm in Texas, under section 2(b)(10) of the FOID Card Act (430 ILCS 65/2(b)(10) (West 2012)), when Texas authorized this use of his weapon without first requiring a licensure process. Though defendant casts his argument in terms of the sufficiency of the evidence, our interpretation of section 2(b)(10) is a question of law that we review *de novo*. See, *e.g.*, *People v. Ward*, 215 Ill. 2d 317, 324 (2005) (applying *de novo* review where "[d]efendant's sufficiency-of-the-evidence argument devolve[d] into an issue of statutory interpretation").

¶ 29　　The question is what the General Assembly intended in drafting an exception to the FOID card requirement for "[n]onresidents who are currently licensed or registered to possess a firearm in their resident state." 430 ILCS 65/2(b)(10) (West 2012). The State says that the word "licensed" is limited only to actual, physical licenses, that an individual is "licensed" in his or her "resident state" only if that resident state has issued the individual an official document—a license—to possess a firearm. Thus, because defendant's resident state of Texas did not issue him a formal license to possess a firearm, defendant does not fit within this exception.

¶ 30　　Defendant, on the other hand, claims that the word "licensed" should be read more broadly. He says that the General Assembly, in section 2(b)(10), was not referring only to states that have issued official licenses to gun owners but also, more generally, to states that authorize gun possession without requiring a license in the first place. Thus, because defendant's home state of Texas authorized him to possess a firearm without requiring a license, defendant qualifies as being "licensed" in Texas.

¶ 31　　A federal district court recently addressed this very question and agreed with the more expansive view urged by defendant here. In *Mishaga v. Schmitz*, 136 F. Supp. 3d 981, 993 (C.D. Ill. 2015), the plaintiff, an Ohio resident, sought an order declaring the FOID Card Act unconstitutional. *Id.* at 984. The plaintiff frequently traveled to Illinois to visit friends and wanted to possess a firearm while in her friends' Illinois home. *Id.* She did not "wish to possess

---

[2]Defendant does not claim that he was "registered" in the state of Texas for the purposes of the section 2(b)(10) exception, only that he was "licensed." We will thus limit our analysis to whether defendant was "licensed" to possess the firearm by a non-Illinois governmental entity. 430 ILCS 65/2(b)(10) (West 2012).

or carry a functional firearm outside of her friends' home." *Id.* The plaintiff believed that the FOID Card Act prohibited her from possessing a gun in her friends' home. *Id.* at 985.

¶ 32    The district court, in considering whether the plaintiff had standing to challenge the constitutionality of the FOID Card Act, noted that she could only have standing if she faced a credible threat of prosecution under the FOID Card Act. *Id.* at 987. So the question became whether plaintiff faced a credible threat of prosecution for gun possession under the AUUW statute in Illinois when she brought her gun to Illinois, or whether section 2(b)(10) of the FOID Card Act exempted her from liability. *Id.* at 989.

¶ 33    Recognizing that the Illinois Supreme Court had not addressed this question and that the FOID Card Act did not define "licensed," the court turned to dictionary definitions of "license" and "licensed." After a thorough review of definitions from Black's Law Dictionary and lay dictionaries, the court found the word "licensed," standing alone, to be ambiguous, as many definitions suggested that being "licensed" involved the receipt of a written certificate or other formal document of approval (the interpretation urged by the State here), while other definitions suggested that mere permission or consent sufficed (consistent with defendant's interpretation here). *Id.* at 990-91.

¶ 34    For example, the court noted that the tenth edition of Black's Law Dictionary defined "licensed" as " '[h]aving official permission to do something, usu. as evidenced by a written certificate.' " *Id.* at 990 (quoting Black's Law Dictionary (10th ed. 2014)). That same dictionary defined "license" as " '[a] privilege' " or " 'permission' " and included the word "permit" as a synonym. *Id.* at 991 (quoting Black's Law Dictionary (10th ed. 2014)). An earlier edition of that same dictionary defined "license" as both " 'permission by a competent authority' " and a " 'certificate or the document itself which gives permission.' " *Id.* (quoting Black's Law Dictionary 829 (5th ed. 1979)). A lay dictionary gave competing definitions that likewise cut both ways, defining the verb "license" as " 'to issue a license to' " and " 'to permit or authorize esp. by formal license' " and merely " 'to give permission or consent to.' " *Id.* (quoting Merriam Webster's Collegiate Dictionary 671 (10th ed. 1997)).

¶ 35    Having found nothing definitive from the dictionaries, the court then considered the fact that the word "licensed" does not stand alone in section 2(b)(10); the operative phrase is "licensed *or registered*" in one's home state. (Emphasis added.) 430 ILCS 65/2(b)(10) (West 2012). The court reasoned that the word "registered" unmistakably connoted some official state action, such as the enrolling of one's name on an official list. *Mishaga*, 136 F. Supp. 3d at 993. The court concluded that licensure must therefore mean something beyond such official state action; otherwise, it would be redundant with registration:

> "If a person were already enrolled in an official list to possess a firearm in her resident state, what further purpose would a license, as [the plaintiff] insists is required, serve to impart proper state authorization? *** 'Licensed,' as used in [section 2(b)(10)], must, therefore, mean something other than to be entered onto official lists. In light of the definitions that show that the concept of 'license' does not require a document and the deployment of the nonsurplusage canon to distinguish 'licensed' from 'registered,' the Court concludes that [the] *Defendants' definition of 'licensed'—legal eligibility, with or without a license document—provides the more persuasive reading* of [section 2(b)(10)]." (Emphasis added.) *Id.*

¶ 36    The court also noted that a majority of states do not have registration requirements like the FOID Card Act or any licensure requirements at all. *Id.* at 996-97. Thus, if "licensed" meant

only being issued a physical license to own a firearm, then "nonresidents hailing from 37 states in all, including *** Ohio, could never qualify under [section 2(b)(10)]." *Id.* at 997. The court declined to read section 2(b)(10) as requiring a physical document in all circumstances to avoid what it considered an "absurd" result. *Id.* Thus, the court ruled that the proper interpretation of "licensed" meant not only being issued an official, physical license to possess a firearm but also including, more generally, legal eligibility to possess a firearm. *Id.*

¶ 37    We are not bound by a federal court's interpretation of an Illinois statute. *People v. Nance*, 189 Ill. 2d 142, 146 (2000). For the reasons that follow, we respectfully disagree with *Mishaga*'s interpretation of section 2(b)(10). We hold, instead, that when the General Assembly provided an exemption to the FOID card requirement for nonresidents "currently licensed or registered to possess a firearm in their state," the word "licensed" referred only to nonresidents who had received an official license from their home state to possess a firearm. 430 ILCS 65/2(b)(10) (West 2012).

¶ 38    First, we take issue with the notion that the term "licensed" in subsection (b)(13) is ambiguous. No doubt, as *Mishaga* points out, the dictionaries contain competing definitions of "licensed" as well as the noun or verb "license." And in the past, the word "license" was used in at least one context in Illinois to describe someone who had permission, expressed or implied, to enter onto someone's land when conducting business for his own purpose—a "licensee"—which obviously did *not* involve the issuance of a formal certificate of approval. See, *e.g.*, *Stephen v. Swiatkowski*, 263 Ill. App. 3d 694, 698 (1994) ("A licensee *** is 'one who enters upon the premises of another by permission for his own purposes.' " (quoting *Kapka v. Urbaszewski*, 47 Ill. App. 2d 321, 325 (1964))).

¶ 39    So there are, to be sure, contexts in which a "license" to do something does not involve the formal issuance of a certificate from the government. But we do not believe that this is one of those contexts.

¶ 40    The FOID Card Act is a regulatory act. See *People v. Mosley*, 2015 IL 115872, ¶ 36 (referring to FOID card requirements as "meaningful regulation" (internal quotation marks omitted)); *Coram v. State of Illinois*, 2013 IL 113867, ¶ 103 (Burke, J., specially concurring, joined by Freeman, J.) (referring to FOID Card Act as "state regulatory scheme"). It requires the issuance of a license—a FOID card—for the possession of a firearm and contains many provisions governing the circumstances under which the FOID card will be allowed or denied, as well as many exceptions to the requirement. Section 1 of the FOID Card Act states that its intended purpose is to "establish[ ] a practical and workable system by which law enforcement authorities will be afforded an opportunity to identify those persons who are prohibited" from buying or possessing firearms. 430 ILCS 65/1 (West 2012).

¶ 41    There are criminal penalties attached to some of the provisions, but that does not change the fact that the purpose of the law is to set up a regulatory system for the possession of firearms in Illinois. In fact, the existence of criminal penalties only bolsters that point. Every statutory scheme of regulation first prohibits an activity generally and then, of course, allows for that activity to be conducted through an official government permit or license, which will only be granted under certain specified circumstances. This is true of gambling, the sale of liquor, the practice of medicine, the issuance of insurance, and countless other activities.

¶ 42    This point is significant because, in the sense of a regulatory statute, the word "licensed" does not strike us as ambiguous at all. "In the context of professional regulation, a license is defined as 'a right or permission granted in accordance with law by a competent authority to

engage in some business or occupation, to do some act, or to engage in some transaction which but for such license would be unlawful.' " *Christmas v. Dr. Donald W. Hugar, Ltd.*, 409 Ill. App. 3d 91, 96 (2011) (quoting Webster's Third New International Dictionary 1304 (1981)); see also *Wilkie v. City of Chicago*, 188 Ill. 444, 453 (1900) (defining "license" in context of regulatory statute governing plumbing to be "a formal permission from proper authorities to perform certain acts or carry on a certain business which without such permission would be illegal"). Again, the point is that there must be official action by the government to permit the activity, which otherwise has been rendered illegal by that government.

¶ 43    We thus disagree with defendant, and the court in *Mishaga*, that the word "licensed" in subsection (b)(10) refers to authorization by a state without any formal approval or licensure requirement. In the context of the FOID Card Act, we think the only reasonable interpretation of the word "licensed" is the one commonly understood in the regulatory context—a right granted formally by the government to engage in an activity that otherwise would be illegal under that government's law. We believe that the subsection (b)(10) reference to nonresidents "currently licensed *** to possess a firearm in their state" can only refer to nonresidents who have complied with a required governmental process and received an official license from their home state to possess a firearm. 430 ILCS 65/2(b)(10) (West 2012).

¶ 44    Our conclusion is bolstered by reference to another exception to the FOID Card Act found in section 2, that was added after subsection (b)(10). See *In re Detention of Lieberman*, 201 Ill. 2d 300, 320-21 (2002) ("A subsequent amendment to a statute may be an appropriate source for discerning legislative intent."); *People v. Parker*, 123 Ill. 2d 204, 211 (1988) (same).

¶ 45    That more recent exception is subsection (b)(13) of section 2. See 430 ILCS 65/2(b)(13) (West 2012). We lay out that exception, which applies to nonresident hunters, along with the exception at issue in this case, subsection (b)(10), below:

"(b) The provisions of this Section regarding the possession of firearms, firearm ammunition, stun guns, and tasers do not apply to:

* * *

(10) Nonresidents who are currently licensed or registered to possess a firearm in their resident state;

* * *

(13) Nonresident hunters *whose state of residence does not require them to be licensed or registered to possess a firearm* and only during hunting season, with valid hunting licenses, while accompanied by, and using a firearm owned by, a person who possesses a valid Firearm Owner's Identification Card and while in an area within a commercial club licensed under the Wildlife Code where hunting is permitted and controlled, but in no instance upon sites owned or managed by the Department of Natural Resources[.]" (Emphasis added.) 430 ILCS 65/2(b)(10), (13) (West 2012).

¶ 46    Subsection (b)(13) was added to section 2 in 1988 by Public Act 85-1336, after subsection (b)(10) was already in existence. See Pub. Act 85-1336, § 1 (eff. Aug. 31, 1988). Public Act 85-1336 did two things. First, it amended the Wildlife Code to create a certain number of free permits to hunt turkey and deer for shareholders of corporations that owned a certain amount of property in Illinois, and only for hunting on that property, regardless of whether those

shareholders resided in Illinois or elsewhere. *Id.* § 2. Second, it created this exception to the FOID Card Act for nonresident hunters. *Id.* § 1.

¶ 47 Obviously, subsection (b)(13) uses different language to describe nonresidents than does subsection (b)(10). While subsection (b)(10) refers to nonresidents "currently licensed or registered to possess a firearm in their resident state," subsection (b)(13) refers to nonresident hunters "whose state of residence does not require them to be licensed or registered to possess a firearm." 430 ILCS 65/2(b)(10), (13) (West 2012).

¶ 48 The inescapable conclusion from this comparison is that, by explicitly mentioning states that "do[ ] not require" licensure or registration to possess a gun in subsection (b)(13), the General Assembly was signaling that it understood subsection (b)(10) as applying only to states that *do* require licensure or registration and to those nonresidents who have complied with that licensure or registration requirement. In other words, if subsection (b)(10) included states that authorized gun possession without a formal licensure or registration requirement, as defendant here claims and as *Mishaga* held, there would have been no need for the legislature to use the language it did in subsection (b)(13)—those states already would have been covered in subsection (b)(10).

¶ 49 The only possible way that we could read subsections (b)(10) and (b)(13) otherwise, but still in harmony with one another, would be if for some reason, the General Assembly only wanted subsection (b)(13) to apply to nonresidents of those states that do not require licensure or registration for the possession of firearms—in other words, if for some reason, the legislature intended to *exclude* nonresidents who have received actual licenses, or have actually registered, in their home states. If that were the case, then it would not matter whether subsection (b)(10) included both categories of states or only one, because either way, the legislature would have needed to specifically describe only non-licensure/registration states in subsection (b)(13).

¶ 50 The problem with that alternative possibility is that there is nothing in the language of subsection (b)(13) that leads us to believe that this particular exception was intended to be limited to only that specific category of states. Nor is there any sensible reason why the General Assembly would want to *exclude* from the reach of subsection (b)(13) those nonresidents who have actually gone through a licensing or registration process, while *including* those who were not required to do anything to possess their guns.

¶ 51 If there is any doubt in that regard, the meager legislative history on subsection (b)(13) gives us some insight. Only one legislator spoke to the substance of subsection (b)(13) in floor debate:

> "[T]his amendment addresses only those controlled hunting areas which are private hunting clubs not open space. *** What occurs is salesmen and company presidents invite some of their clients to these controlled hunting areas. They all have hunting licenses. In some cases, they do not have a FOID card. This amendment provides that the individual who is a member of the club is responsible as long as he or she has a valid hunting license. They can hunt there and the person who invites them down as their guest has a FOID card, it would cover these individuals. *** It is not open to all areas of the State where hunting is permitted and I explained the intent in total." 85th Ill. Gen. Assem., House Proceedings, June 16, 1988, at 47 (statements of Representative Mautino).

¶ 52 The co-sponsor's comments suggest that, as the language provides, the purpose behind subsection (b)(13) is to allow members of private hunting clubs, who possess FOID cards, to invite "some of their clients"—non-Illinois residents—to that club. We see no indication here that the co-sponsor was limiting the geographic location of those clients only to states that do not have licensure or registration requirements, and that the sponsor wanted to be sure to *exclude* from this new amendment people who lived in states that required licensure or registration before possessing a firearm.

¶ 53 The only reasonable interpretation of the interplay between subsection (b)(10) and subsection (b)(13) is that the General Assembly felt the need to specify states that "do[ ] not require" licensure or registration for gun possession because the legislature understood subsection (b)(10) as not already including that group of states.

¶ 54 The court in *Mishaga* held otherwise. The court recognized the "persuasive force" of the impact of subsection (b)(13) on an analysis of subsection (b)(10). *Mishaga*, 136 F. Supp. 3d at 1000. But it rejected the argument on three grounds. First, it viewed the public act that created subsection (b)(13) in its entirety and concluded that "the purpose of Public Act 85-1336 was not to carve out a new FOID Act exception for nonresident hunters on private club land. Rather, the purpose was only to clarify the regulations that would apply to private club land, dictating how many hunting permits would be issued, who was permitted to hunt on that land, and under what circumstances." *Id.* at 999.

¶ 55 We respectfully disagree with this interpretation of the public act. We do not see how we could conclude that the purpose of Public Act 85-1336 "was not to carve out a new FOID Act exception for nonresident hunters on private club land" (*id.*) when, in fact, that is precisely what that public act did. We are not suggesting that this was the act's *only* purpose, or even its predominant purpose. But this rather short public act did only two things—it amended the Wildlife Code to allow a certain number of no-fee permits to hunt turkey and deer on corporate land, and it amended the FOID Card Act to create this new nonresident-hunter exception—and we cannot interpret it as if it did only one of those two things.

¶ 56 Next, the court in *Mishaga* reasoned that subsection (b)(13) substantially overlapped with an earlier nonresident-hunter exception embodied in subsection (b)(5) (430 ILCS 65/2(b)(5) (West 2012)). *Mishaga*, 136 F. Supp. 3d at 999. That exception very generally exempts "[n]onresident hunters during hunting season, with valid nonresident hunting licenses and while in an area where hunting is permitted." 430 ILCS 65/2(b)(5) (West 2012). The court in *Mishaga* found it "difficult to ascertain" any additional conduct in subsection (b)(13) that was not already covered by subsection (b)(5). *Mishaga*, 136 F. Supp. 3d at 999. We agree that it is hard to understand what, exactly, additional conduct was covered by subsection (b)(13) that was not already covered in subsection (b)(5). Subsection (b)(5) is not limited by the nonresident's home state in any way, says nothing about licensure or registration, and covers a rather large swath of conduct in few words, while subsection (b)(13) is extremely narrow, containing multiple qualifiers. But we are not sure what that fact adds to our analysis. The fact that a piece of legislation is duplicative or even unnecessary does not deprive it of the force of law, nor does it permit a court to ignore it.

¶ 57 The court in *Mishaga*'s third reason for disregarding the comparison to subsection (b)(13) was that doing so would conflict with its previous textual interpretation of "licensed" in subsection (b)(10). *Id.* But we have already registered our disagreement with that analysis and

found that the term "licensed" is not ambiguous in the context of a regulatory statute such as the FOID Card Act.

¶ 58    The later amendment of subsection (b)(13) only clarifies what we believe is already clear, that it was the intent of the General Assembly, in drafting subsection (b)(10), to cover only those "licensed" nonresidents who complied with a required licensing process in their home state—who were granted a right that otherwise would be illegal in their home state, absent that license—and not to residents of states that have no such process.

¶ 59    The court in *Mishaga* found it "absurd" that subsection (b)(10) would apply only to states with affirmative licensure or registration requirements, which according to *Mishaga* amounted to only 12 other states in the country besides Illinois. *Id.* at 997. But we do not find such a result to be absurd. It would not be "absurd" for the General Assembly to have a different view of nonresidents hailing from states that attach some governmental process to the possession of guns, compared to those that freely allow gun possession with no official oversight. A licensure procedure might involve a vetting process to ensure that a gunowner first satisfies certain safety or eligibility requirements. A registration process would at least track the identity of gunowners, and possibly the guns they acquire as well. And a system of identifying those eligible to possess firearms, versus those ineligible to do so—the very purpose of the FOID Card Act (see 430 ILCS 65/1 (West 2012))—could be more efficiently served where a nonresident is able to immediately produce an official document to a peace officer in Illinois, be it a license or evidence of registration in one's home state.

¶ 60    We are not suggesting that the General Assembly's decision to make this distinction among the states was a finely-tuned response, was wholly or even marginally effective, or was a prudent decision versus an overbearing, paternalistic one. The salient point is that we disagree with *Mishaga* that this result is so "absurd" that it cannot be what the General Assembly intended.

¶ 61    We hold that the section 2(b)(10) application to nonresidents "currently licensed *** to possess a firearm in their resident state" applies only to nonresidents who have complied with an official state process for licensure in their home state. 430 ILCS 65/2(b)(10) (West 2012). As defendant concedes that his resident state of Texas does not have a licensure or registration requirement in his home state for the mere possession of firearms, he can find no refuge under section 2(b)(10) for his convictions on counts II and V.

¶ 62    Defendant also contends that his military permit satisfied section 2(b)(10), because it was the functional equivalent of a state license. He argues that, by obtaining the military permit at Fort Bliss, he satisfied the purpose of the FOID Card Act by having an official record of his firearm ownership.

¶ 63    We reject defendant's argument. The plain language of section 2(b)(10) refers to a defendant's license or registration in his or her "resident *state*." (Emphasis added.) 430 ILCS 65/2(b)(10) (West 2012). Thus, section 2(b)(10) requires a defendant to obtain a license or register a firearm with the state where he resides, not with a military installation.

¶ 64    Critically, other exceptions in section 2(b) refer specifically to members of the military:

"(b) The provisions of this Section regarding the possession of firearms, firearm ammunition, stun guns, and tasers do not apply to:

***

- 11 -

(2) Members of *the Armed Forces of the United States or the National Guard*, while engaged in the operation of their official duties;

*** 

(4) Members of bona fide veterans organizations which receive firearms directly from *the armed forces of the United States*, while using the firearms for ceremonial purposes with blank ammunition[.]" (Emphases added.) 430 ILCS 65/2(b)(2), (4) (West 2012).

These provisions show that the legislature intended to consider the armed forces of the United States as a separate entity from states and knew how to specify that entity when it so desired. Had the legislature intended to include the armed forces as a body from which a defendant could obtain a license or register his or her firearm, it would have used those words in section 2(b)(10). The absence of any reference to the armed forces in section 2(b)(10) suggests that the legislature did not intend to allow military licensure or registration to fall within the scope of that exception. See *People v. Hudson*, 228 Ill. 2d 181, 193 (2008) (when legislature uses certain language in one part of statute and different language in another, court may assume different meanings were intended).

¶ 65         With regard to defendant's position that his military permit served the basic informational purpose of the FOID Card Act, we lack sufficient information to make that determination. The record contains no information regarding Illinois's access to Fort Bliss's firearm ownership records or whether Fort Bliss even makes that information public. Nor do we know if Texas receives information from Fort Bliss regarding firearm ownership. But we note that it would appear to be illogical for Texas to compile any such information, since Texas does not require any licensing for firearm ownership for nonmilitary residents. Without additional information, and given the plain language of the FOID Card Act, defendant's military permit cannot be said to serve the same function as the legislature intended under section 2(b)(10).

¶ 66         We recognize that defendant testified that the permit allowed him to own the weapon "on post and off post." But Texas requires no license for mere firearm ownership. So of course he could own the weapon off-base with his military permit; he needed no permit at all to own a weapon off of the base in Texas. But as we stated above, defendant could not satisfy section 2(b)(10) unless he completed some form of licensure or registration process through the state of Texas. We have no evidence that he did so and hold that defendant was not exempt from liability under section 2(b)(10).

¶ 67         We must address one additional matter, specific only to count V, the count that charged defendant with possession of the firearm on his person, not in his vehicle. Recall that the police officer who recovered the firearm from defendant's car did not observe defendant in possession of the firearm previously that night, outside the car. Rather, the conviction on count V was based on Noel Tenayuca's testimony that defendant was carrying a gun in his waistband as he entered the bar.

¶ 68         Defendant argues that the evidence was insufficient to support a conviction on count V. He argues that Tenayuca's testimony about defendant's possession of a gun was "weak" and "vague" because he testified that he did not remember much of the night. But Tenayuca testified more than two years after the occurrence. It is reasonable to conclude that his memory of the night would be diminished, aside from the memorable fact that he saw defendant display a firearm. In any event, the trial court was tasked with evaluating Tenayuca's credibility and memory. See *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007) (when reviewing sufficiency of

evidence, trier of fact's credibility determinations entitled to "great weight," since trier of fact "saw and heard the witnesses"); *People v. DePue*, 229 Ill. App. 3d 615, 621 (1992) ("[T]he trial judge, as the trier of fact, was in the best position to judge the witnesses' demeanors and memories as they testified, and to determine the weight to be given their testimony."). We see no reason to second-guess that conclusion on appeal.

¶ 69 We thus hold that the evidence was sufficient to support defendant's AUUW conviction under Count V, regarding his possession of a firearm on his person outside the bar.

¶ 70 Having found sufficient evidence to convict defendant on both counts II and V, we now turn to defendant's constitutional claims regarding his AUUW convictions.

¶ 71 B. Constitutional Challenge

¶ 72 Defendant contends that "[t]he Illinois FOID card requirement" violates the Second Amendment to the United States Constitution. U.S. Const., amend. II.

¶ 73 At the outset, we must clarify what statute defendant possesses standing to challenge. While defendant does not specify what statute or statutes he is challenging, we take his claim to be a challenge to the element of the AUUW statute relating to the absence of a FOID card (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2012)), as that is the statute defendant was convicted of violating. See *People v. Aguilar*, 2013 IL 112116, ¶ 12 (defendant possessed standing to challenge statute he was convicted of violating). Moreover, as we mentioned above, the Illinois Supreme Court has incorporated the exceptions in section 2(b) of the FOID Card Act into the AUUW statute, meaning that defendant has standing to challenge the scope of the nonresident exception in section 2(b)(10) insofar as it relates to the AUUW statute. But defendant cannot challenge the constitutionality of the FOID Card Act itself, as he has not been convicted of violating any of the provisions of that statute. See *People v. Myers*, 181 Ill. App. 3d 769, 771 (1989) (defendant lacked standing to challenge statute he was not convicted of violating).

¶ 74 Next, we clarify the standard of review applicable to a challenge to the constitutionality of a statute. Statutes are presumed to be constitutional, and the party challenging the constitutionality of a statute bears the burden of proving that the statute is unconstitutional. *Aguilar*, 2013 IL 112116, ¶ 15. We have a duty to construe any statute in a manner that upholds the statute's constitutionality. *Id.* We apply *de novo* review. *Id.*

¶ 75 Defendant contends that the FOID card requirement of the AUUW statute violates the second amendment both on its face and as applied to him. A party challenging a statute's facial constitutionality bears the burden of showing that the statute is unconstitutional in all of its applications. *People v. Burns*, 2015 IL 117387, ¶ 27. But, in addressing a facial challenge, we still focus on "the group for whom the law is a restriction, not the group for whom the law is irrelevant." (Internal quotation marks omitted.) *Id.* By contrast, an " 'as applied' " constitutional challenge requires a defendant to show that the statute violates the constitution as it applies to him. *People v. Garvin*, 219 Ill. 2d 104, 117 (2006). If a statute is constitutional as applied to a defendant, a facial challenge to the same statute will necessarily fail because that means there is at least one set of facts where the statute may be constitutionally applied. *Id.* at 125. Thus, we first address defendant's as-applied challenge to the FOID card element of AUUW.

¶ 76 We apply a two-step approach to a second amendment challenge. *People v. Mosley*, 2015 IL 115872, ¶ 34. First, we look to the text and history of the second amendment "to determine whether the challenged law imposes a burden on conduct that was understood to be within the scope of the second amendment's protection at the time of ratification." *Id.* If the conduct is not within the scope of the second amendment, then the regulated activity "is categorically unprotected." *Id.* But if the historical evidence is inconclusive or suggests that the regulated activity is not unprotected, then we apply "the appropriate level of means-ends scrutiny" and look to "the strength of the government's justification for restricting or regulating the exercise of second amendment rights." *Id.*

¶ 77 With respect to the first step, in *Aguilar*, 2013 IL 112116, ¶ 21, the Illinois Supreme Court recognized that "the second amendment protects the right to possess and use a firearm for self-defense outside the home." The statute at issue in *Aguilar*, section 24-1.6(a)(1), (a)(3)(A), (d) of the AUUW statute (720 ILCS 5/24-1.6(a)(1), (a)(3)(A), (d) (West 2008)), violated that right because it operated as a " 'flat ban on carrying ready-to-use guns outside the home.' " *Aguilar*, 2013 IL 112116, ¶ 19 (quoting *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012)).

¶ 78 Based on *Aguilar*, defendant's possession of a firearm outside his home was entitled to some protection by the second amendment. But as the court in *Aguilar* recognized, the fact that the second amendment protects the right to possess and use a firearm for self-defense outside the home does not mean "that such a right is unlimited or is not subject to meaningful regulation." *Aguilar*, 2013 IL 112116, ¶ 21. We thus turn to the second question: whether the government could regulate defendant's possession of a firearm in this case.

¶ 79 In *Mosley*, the Illinois Supreme Court held that "the FOID card requirement of [the AUUW statute] is consistent with [the supreme court's] recognition that the second amendment right to possess firearms is still 'subject to meaningful regulation.' " *Mosley*, 2015 IL 115872, ¶ 36 (quoting *Aguilar*, 2013 IL 112116, ¶ 21). In reaching that conclusion, the court cited *People v. Taylor*, 2013 IL App (1st) 110166, ¶¶ 28-32, where this court upheld the FOID card requirement as a reasonable restriction on the second amendment rights of an individual. *Mosley*, 2015 IL 115872, ¶ 36. These cases make clear that, as a general matter, the FOID card requirement in the AUUW statute is a constitutional means of regulating firearm possession. See also *Berron v. Illinois Concealed Carry Licensing Review Board*, 825 F.3d 843, 847 (7th Cir. 2016) (upholding concealed-carry licensure requirement in Illinois against second amendment challenge: "If the state may set substantive requirements for [gun] ownership, which *Heller* says it may, then it may use a licensing system to enforce them.").

¶ 80 This case law is consistent with decisions in other states where courts upheld licensure or registration requirements as prerequisites to possessing a firearm inside or outside the home. See, *e.g.*, *Kwong v. Bloomberg*, 723 F.3d 160, 168-69 (2d Cir. 2013) (New York City's licensure fee for handgun possession, even within home, did not violate second amendment); *Drake v. Filko*, 724 F.3d 426, 435 (3d Cir. 2013) (New Jersey licensure requirement that applicant show "justifiable need" to carry firearm in public was constitutional); *Heller v. District of Columbia*, 670 F.3d 1244, 1254-55 (D.C. Cir. 2011) (requirement to register firearm did not violate second amendment); *Williams v. Puerto Rico*, 910 F. Supp. 2d 386, 395 (D.P.R. 2012) (Puerto Rico law requiring license to carry firearm did not violate second amendment); *Hertz v. Bennett*, 751 S.E.2d 90, 94 (Ga. 2013) (Georgia law requiring licensure to carry weapon was constitutional); *Delgado v. Kelly*, 8 N.Y.S.3d 172 (App. Div. 2015) (New York licensing requirement to possess handgun in home did not violate second amendment); *People*

*v. Perkins*, 880 N.Y.S.2d 209, 210 (App. Div. 2009) (New York's firearm licensing regulations did not violate second amendment); *Commonwealth v. McGowan*, 982 N.E.2d 495, 501 (Mass. 2013) ("We have consistently held \*\*\* that the decisions in *Heller* and *McDonald* did not invalidate laws that require a person to have a firearm identification card to possess a firearm in one's home or place of business, and to have a license to carry in order to possess a firearm elsewhere.").

¶ 81    Simply put, under *Mosley* and *Taylor*, it is constitutional to require an individual to comply with a licensure process before permitting that person to possess a handgun in Illinois.

¶ 82    But our question is a bit more complicated. Defendant is not a resident of Illinois and thus is ineligible for a FOID card. See 430 ILCS 65/4(a)(2)(xiv) (West 2012) (requiring FOID card applicant to submit proof that he is "a resident of the State of Illinois"). And we have just held above that the exception to the FOID card requirement for nonresidents "licensed \*\*\* to possess a firearm" in their home state applies only to nonresidents who have complied with an official state process for licensure in their home state. 430 ILCS 65/2(b)(10) (West 2012). Because Texas does not *have* a licensure process for the mere possession of firearms in his state, defendant thus claims that the effect of the FOID card requirement, incorporated into the AUUW statute, results in a flat ban on his ability to lawfully possess a firearm in Illinois.

¶ 83    The flaw in defendant's argument is that Texas *does* have a licensure process to obtain a concealed-carry permit in Texas that would have allowed him to carry a firearm on his person or in his car in Texas—a license that clearly would qualify him as being "licensed" in Texas to possess a firearm under section 2(b)(10) of the FOID Card Act. See Tex. Gov't Code Ann. § 411.172(a) (West 2012). It is undisputed that defendant did not obtain a concealed-carry license from Texas.

¶ 84    And while it is not necessary that the Texas licensing requirement match up perfectly with the Illinois licensure requirement for a FOID card, it so happens that the licensure requirements are substantially similar. An applicant for a concealed-carry license in Texas is subject to age and residency requirements; cannot have committed a felony or certain other criminal or juvenile offenses; cannot suffer from a substance-abuse problem or psychiatric infirmity; cannot be delinquent in child support payments or taxes; and cannot be the subject of a protective order. See *id.* To obtain a FOID card in Illinois, an applicant must satisfy an age and residency requirement; cannot have committed a felony or certain other criminal or juvenile offenses; may not suffer from substance abuse or a psychiatric, developmental, or intellectual disability; cannot be subject to a protective order; and cannot be an immigrant living illegally in the country or, if an immigrant residing legally in the United States, must satisfy certain criteria. See 430 ILCS 65/4 (West 2012).

¶ 85    By requiring that defendant satisfy this licensing process in Texas in order to fit within the FOID card exemption in Illinois, and thus avoid liability under the AUUW statute, the state of Illinois is essentially requiring little more of defendant than it would require of its own residents to obtain a FOID card. A Texas resident such as defendant has no basis to portray the AUUW's FOID card requirement as unduly burdensome, much less a "flat ban" on his right to lawfully possess a firearm in Illinois. In any event, as the FOID card requirement, itself, satisfies the second amendment under *Mosley* and *Taylor*, likewise any supposed burden placed on a resident of Texas to fit within the relevant exemption to the FOID card requirement is consistent with the second amendment.

¶ 86    Nor do we find anything unreasonable about the FOID card requirement as incorporated into the AUUW statute. As we previously noted, the purpose of the FOID card requirement is "to provide a system of identifying persons who are not qualified to acquire or possess firearms." 430 ILCS 65/1 (West 2012). In order to identify a person who is unqualified to acquire or possess a firearm, there must be some record of their qualifications. Section 2(b)(10) provides that, if a nonresident can create some record of their capability to handle firearms in their home state—whether by obtaining some form of a physical license to carry a firearm or registering his or her firearm ownership with his or her home state—then the nonresident can escape liability under the AUUW statute. Without some type of licensure or registration, the purposes of the FOID card requirement would be undermined. There is nothing unreasonable, arbitrary, or oppressive in the AUUW's FOID card requirement.

¶ 87    We thus reject defendant's as-applied challenge to the AUUW statute. Because we have found at least one set of facts—the one before us—in which the AUUW statute can be constitutionally applied to nonresidents such as defendant, his facial challenge likewise fails. *Garvin*, 219 Ill. 2d at 125 (if statute is constitutional as applied to individual challenging it, defendant cannot sustain facial challenge, which requires showing that statute is unconstitutional in all its applications).

¶ 88    We emphasize again what we mentioned in a footnote at the outset—that this case does not involve or affect any interpretation of the Firearm Concealed Carry Act (430 ILCS 66/1 *et seq.* (West 2014)), a law that was enacted after the acts constituting defendant's offenses, and a law which to a large extent has changed the landscape of firearm possession and use in this state.

¶ 89    We also stress that defendant does not claim that Illinois has improperly discriminated against him under the federal privileges and immunities clause (U.S. Const., art. IV, § 2) or the equal protection clause (U.S. Const., amend. XIV), nor does defendant allege an unconstitutional interference with interstate commerce (see U.S. Const., art. I, § 8). Thus, the question before us is not whether Illinois improperly discriminated against nonresidents; it is whether, under the second amendment, Illinois could require nonresidents within its borders to possess some kind of licensure or registration for loaded firearms. Because licensure is a reasonable regulation of the possession of loaded firearms outside the home for self-defense, we reject defendant's constitutional challenges and affirm his convictions for AUUW.

¶ 90                                    III. CONCLUSION
¶ 91    For all of these reasons, we affirm defendant's convictions.

¶ 92    Affirmed.