2020 IL App (2d) 170932-U
No. 2-17-0932
Order filed June 12, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15-CF-599 |
| | ) | |
| ARAMIS HATCH, | ) ) | Honorable James C. Hallock, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Trial counsel was ineffective for failing to file a motion to quash arrest and suppress evidence where police lacked probable cause to believe that defendant's possession of a firearm was illegal.  Therefore, we reverse outright defendant's convictions of aggravated unlawful use of a weapon.

¶ 2   Following a bench trial, defendant Aramis Hatch, was convicted of two counts of aggravated unlawful use of a weapon (AUUW) for possessing a concealed and loaded firearm while not on his land or in his home (or that of another person as an invitee) without a valid concealed carry license (720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2014) or a valid Firearm Owner's Identification (FOID) card (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2014).  Defendant

was sentenced to 180 days in jail and 24 months' probation. Defendant appeals, arguing that (1) his trial counsel was ineffective for failing to move to quash his arrest and suppress evidence because the responding officers lacked probable cause to believe that his possession of the firearm was illegal at the time he was arrested; (2) he was either exempt from the Firearm Owner's Identification Act and the Firearm Concealed Carry Act or the statutes were unconstitutional as applied to him; and (3) one of his convictions should be vacated based on the one-act, one-crime doctrine. We agree with defendant that his trial counsel was ineffective for not moving to quash his arrest and suppress the evidence, and we therefore reverse his convictions outright.

¶ 3                                     I. BACKGROUND

¶ 4      On August 18, 2015, defendant was charged by indictment with unlawful possession of firearm ammunition and two counts of AUUW. 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5); (a)(1), (a)(3)(C) (West 2014). The two AUUW counts were based on defendant possessing the same firearm under different theories of culpability: not having a license under the Firearm Concealed Carry Act and not having a valid FOID card. The State *nolle prossed* the count for unlawful possession of firearm ammunition, and the case proceeded on the two AUUW counts.

¶ 5      Prior to trial, the State filed a motion *in limine* seeking to bar any evidence or argument regarding defendant's residency in the state of Georgia, explicitly anticipating that defendant would "argue that [he] is allowed to carry a firearm in Georgia without a license" such that his possession of a firearm in Illinois was lawful. Relying on the First District's holding in *People v. Wiggins*, 2016 IL App (1st) 153163, ¶ 43, the State argued that defendant's Georgia residency was irrelevant unless that state had issued him a formal, physical license. It argued that, because defendant did not have a formal license from the state of Georgia to possess a firearm, he did not fit the exemption in the Firearm Owners Identification Card Act (FOID Card Act) applicable to

"[n]onresidents who are currently licensed or registered to possess a firearm in their resident state." 430 ILCS 65/2(b)(10) (West 2014). At hearing on the motion *in limine*, defense counsel conceded that *Wiggins* was directly on point concerning defendant's alleged violation of the FOID Card Act, but argued that it should not be followed. Instead, counsel argued that the exception in the FOID Card Act for nonresidents should be read more broadly to include states that allow their residents to possess a firearm without first being licensed or registered. Defense counsel further argued that *Wiggins* had no bearing on defendant's charge relating to violation the Firearm Concealed Carry Act because that case did not address concealed carry licenses.

¶ 6    Stating that *Wiggins* was controlling authority, the circuit court granted the State's motion *in limine* and barred defendant from "introducing the Georgia law and introducing the defense of '[i]t was okay in Georgia, so it's okay in Illinois." In announcing its ruling, the trial court commented that "[i]t's a mystery to this court" how "these people in the [First] District could have reconciled this to the Constitution." The judge stated that, nevertheless, "I think [*Wiggins*] is controlling on me. I think I have to follow this."

¶ 7    A bench trial was held on April 3, 2017. The State's evidence demonstrated that shortly after 9:30 p.m. on April 11, 2015, Elgin police officer Greg Lynch was dispatched to an address on Bartlett Place in Elgin in response to a 911 call regarding a "potential stolen vehicle." The dispatch did not mention a firearm. When he arrived in the area, he parked his squad car on a side street and walked to Bartlett Place. He began looking for the person who called 911. He came upon a vehicle parked at a stop sign, and he saw a female in the driver's seat talking on a cell phone. He later identified her as Rebecca Luellen. Officer Lynch noticed that Luellen was looking at him, and he heard her say into the cell phone, "[y]es yes, there is an officer here. Yes, he's approaching me now." He assumed that Luellen had made the 911 call. As he approached Luellen

to speak about the 911 call, he did not see anything suspicious or any criminal acts being committed.

¶ 8       Officer Lisandro Ramirez arrived at the scene while Officer Lynch was speaking with Luellen.  He noticed that there was a front-seat passenger in the vehicle, so he walked around the rear of the vehicle and approached the passenger side.  He shined his flashlight into car, knocked on the window, and instructed the passenger, who was later identified as defendant, to roll down the window.  As defendant moved his right hand from his lap to roll down the window, Officer Ramirez "noticed the pistol grip of a firearm—possible firearm" protruding from the right-side pocket of defendant's zip-up jacket.  Because defendant was seated, the pockets of his jacket were near his lap, and so "the pistol was sitting right on his lap."

¶ 9       Officer Ramirez immediately drew his sidearm for his own safety and pointed it at defendant, and he told Officer Lynch that there was a gun inside the vehicle.  Officer Lynch also drew his sidearm, and he pointed it at Luellen.  Officer Ramirez ordered defendant to not touch the gun, and defendant put his hands up.  Defendant then put both of his hands out the car window at Officer Ramirez's direction.

¶ 10      After Officer Lynch secured Luellen with the help of a sergeant that had also arrived on the scene, he went to the passenger side of the vehicle to assist Officer Ramirez.  He pointed his sidearm at defendant while Officer Ramirez instructed him to exit the vehicle.  After defendant exited, Officer Ramirez secured his own sidearm and handcuffed defendant while Officer Lynch maintained defendant at gunpoint.  Officer Lynch removed a firearm from the front right pocket of the jacket defendant was wearing, and defendant was placed in the backseat of Officer Lynch's squad car.  Defendant did not resist the officers, and he fully complied with their commands.  The

firearm recovered by Officer Lynch was a semiautomatic .45 caliber Ruger pistol. He unloaded seven rounds of ammunition from the gun and secured it in the trunk of one of the squad cars.

¶ 11   Officer Lynch then transported defendant to the Elgin police department. While defendant was in the squad car, he said to officer Lynch: "[y]ou caught the right n\*\*\*. I stand my ground. I'm from a place where we stand our ground. I'm a thug." Concerning the firearm, defendant stated: "I gave it to you because that's all you got. You didn't take it from me. I gave it to you." Finally, he stated that "[e]veryone else out there has a gun. It's bullshit. The law says I can have one. It's mine. The pistol's mine." When defendant spoke, Officer Lynch did not advise him of his *Miranda* rights.

¶ 12   At the time of defendant's arrest, neither officer had any knowledge regarding whether defendant had a FOID Card, nor did they have any knowledge regarding whether defendant legally possessed the firearm. Neither a FOID card nor a license under the Firearm Concealed Carry Act was recovered from defendant.

¶ 13   The defense did not present any evidence or witnesses, but instead presented written proffers of testimony and arguments it would have presented had the circuit court denied the State's motion *in limine*. According to the proffers, defendant would have testified that on April 11, 2015, he was a Georgia resident and was visiting friends and family in Illinois. He was in Illinois longer than planned because he had a case pending in Cook County, and a condition of his bond prohibited him from leaving the state. While he was in Illinois, he stayed with friends, family members, and even in his car. Defendant purchased the firearm from Luellen and created a bill of sale on January 15, 2015. He was not prohibited from owning or possessing a firearm under federal law. He was familiar with Georgia law under which he was eligible to carry a firearm in public without a physical license. He was also aware of the exception to the FOID Card Act allowing

non-residents to possess a firearm if they are currently licensed or registered to possess a firearm in their home state. Police recovered a current Georgia identification card from him when he was arrested. Defendant's Georgia identification card and Georgia driver's license were attached to the proffer. Defendant would have argued at trial that he fell within the exception to the FOID Card Act for nonresidents who are currently licensed or registered to possess a firearm in their resident state because he is allowed to possess a firearm without a license under Georgia law such that "Georgia permitted and 'licensed' him to possess a firearm."

¶ 14    During closing argument, defense counsel argued, *inter alia*, that defendant's possession of the firearm was simply an exercise of his second amendment rights. Counsel also highlighted Officer Lynch's testimony that he did not see any crimes being committed while he spoke to Luellen, and counsel argued that there was "no indication that [defendant] was using this gun in any criminal purpose. *** [A]ll [the officers] saw was that [defendant] had a gun." She argued that, under the second amendment, an individual may possess a firearm both inside and outside of the home. She also stressed the officers' testimony that defendant fully complied with all their commands.

¶ 15    On April 3, 2017, the court found defendant guilty on both AUUW counts. Defendant thereafter moved for a new trial arguing, *inter alia*, that the court erred in granting the State's motion *in limine* and barring defendant from presenting evidence related to his Georgia residency and Georgia gun laws, as well as erred in denying his motion for a directed verdict because the evidence showed he was exercising his second amendment right to possess a firearm for self-defense outside the home. On October 5, 2017, the circuit court entered a written order denying defendant's motion for a new trial. In so ruling, the court found that defendant "was not licensed to carry a firearm in Georgia inasmuch as Georgia does not have a system for licensing residents

to carry firearms. *** Georgia allows [defendant] to possess a firearm without a license, he does not possess a license for Illinois to recognize" and, based on *Wiggins*, defendant was not exempt under the FOID Card Act. Defendant was sentenced to 180 days in jail and 24 months' probation.

¶ 16    Defendant timely appealed.

¶ 17                                II. ANALYSIS

¶ 18    Defendant argues on appeal that (1) his trial counsel was ineffective for failing to file a motion to quash his arrest and suppress the firearm and his statements to Officer Lynch because the police officers lacked probable cause to believe that his possession of the firearm was illegal at the time of his arrest; (2) he was statutorily exempt from the FOID Card Act and the Firearm Concealed Carry Act, and that a narrower interpretation of the statutory exemptions would be unconstitutional as applied to him; and (3) in the alternative, one of defendant's AUUW convictions should be vacated under one-act, one-crime principles because both counts were based on the possession of the same firearm. We address only the first issue, which is meritorious and dispositive.

¶ 19    Defendant argues that his trial counsel was ineffective for failing to file a motion to quash his arrest and suppress evidence, which he asserts would have been successful. He asserts that he was arrested without probable cause based only on his possession of a firearm, which he stresses is not illegal *per se* following the decision of our supreme court in *People v. Aguilar*, 2013 IL 112116, and the officers had no knowledge regarding whether his possession was illegal at the time of the arrest. Defendant maintains that, rather than investigate whether his possession of the firearm was lawful, the officers immediately arrested him upon the bare observation of the firearm without asking him to produce a concealed carry license or even asking him to identify himself. He argues that, absent probable cause, the arrest was unlawful such that all the evidence, including

the firearm and the statements he made to Officer Lynch during his transportation to the police station, must be suppressed. Defendant maintains that the motion would have been granted had his counsel filed one, and there was a reasonable probability that the outcome of the trial would have been different.

¶ 20    In response, the State argues that defense counsel's decision to not file a motion to quash arrest and suppress evidence was sound trial strategy because the actions of the police officers were "completely justified and lawful" because they had a reasonable apprehension of danger when they saw a gun protruding from defendant's jacket pocket.[1]  According to the State, "both officers' actions were guided solely by a concern for their safety."  The State relies exclusively on *People v. Colyar*, 2013 IL 111835, which it argues is dispositive of the issue.  It also asserts that the concern the officers had for their own safety was further justified because the record suggests there was a bullet hole in the windshield of the vehicle defendant was in.  According to the State, the motion would have been futile.

¶ 21    We evaluate claims of ineffective assistance of counsel under the familiar standards set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984) and adopted in Illinois by *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984).  To succeed on a claim for ineffective assistance of counsel, a defendant must satisfy two prongs, namely that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) the deficient

---

[1] The State makes no argument that the record is inadequate to evaluate defendant's claim. See *People v. Henderson*, 2013 IL 114040, ¶¶ 21-22 (noting that a collateral attack may be a more appropriate mechanism for challenging the effectiveness of trial counsel where the record on appeal is incomplete to evaluate the claim).

performance resulted in prejudice. *People v. Manning*, 241 Ill. 2d 319, 326 (2011). Relevant to the first prong, courts have ruled that the decision of whether to file a motion to suppress is generally a matter of trial strategy that is afforded great deference. *People v. White*, 221 Ill. 2d 1, 21 (2006). In the context of demonstrating prejudice under the second *Strickland* prong stemming from trial counsel's failure to file a motion to suppress, "the defendant must demonstrate that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15. A "meritorious" motion to suppress is one that "would have succeeded." *Id*. ¶ 12. A reasonable probability that the trial outcome would have been different occurs when the "probability is sufficient to undermine confidence in the outcome." *People v. Simpson*, 2015 IL 116512, ¶ 35. Because the ineffective assistance of counsel claim was not raised in the trial court below, our review is *de novo. People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24. *De novo* review is also appropriate because the underlying facts relevant to defendant's ineffective assistance of counsel claim are undisputed. See *People v. Falco*, 2014 IL App (1st) 111797, ¶ 14.

¶ 22     We begin by considering the merits of the unargued motion to quash arrest and suppress evidence. The fourth amendment to the United States Constitution and article 1, section 6 of the Illinois Constitution protect citizens against unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970 art. I, § 6; *People v. Bartelt*, 241 Ill. 2d 217, 255 (2011). An individual is entitled to be free from unreasonable government intrusion wherever he or she has a reasonable expectation of privacy. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). The parameters of this right are shaped by the context in which it is asserted because the Constitution does not prohibit all searches and seizures, but rather, only those that are unreasonable. *People v. Gherna*, 203 Ill. 2d 165, 176 (2003). "[T]he 'essential purpose' of the fourth amendment is to impose a standard of

reasonableness upon the exercise of discretion by government officials, including law enforcement officers, to safeguard the privacy and security of individuals against arbitrary invasions." *People v. Jones*, 215 Ill. 2d 261, 269 (2005) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979)).

¶ 23    It is generally understood that there are three tiers of police-citizen encounters that do not constitute an unreasonable seizure. *Gherna*, 203 Ill. 2d at 176.  The first tier involves the arrest of a citizen, which must be supported by probable cause.  To establish probable cause for an arrest, the totality of circumstances known to the arresting officers at the time of the arrest must be such that a reasonably prudent person would believe that the suspect is committing or has committed a crime. *People v. Downey*, 198 Ill. App. 3d 704, 715 (1990).  The second tier of encounters between citizens and police occurs during a *Terry* stop, where law enforcement may conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity that amounts to more than a mere "hunch." *Gherna*, 203 Ill. 2d at 177.  The last tier of police-citizen encounters involves those that are consensual.  These encounters do not implicate the fourth amendment because they involve no coercion or detention. *Id*.

¶ 24    Because defendant was subjected to a warrantless arrest, the arrest necessarily must have been supported by probable cause so as not to be unreasonable under the fourth amendment.  See *People v. Hopkins*, 363 Ill. App. 3d 971, 982 (2005) (noting that an arrest without either a warrant or probable cause violates the fourth amendment).  In evaluating whether the officer had probable cause to arrest an individual, the officer's factual knowledge, based on his or her prior law enforcement experience, is relevant. *People v. Tisler*, 103 Ill. 2d 226, 237 (1984).  Although the standard of probable cause is more demanding than the reasonable suspicion of criminal activity needed to initiate an investigative *Terry* stop, it " 'does not deal with hard certainties, but with probabilities.' " *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *United States v. Cortez*, 449

U.S. 441, 418 (1981). "Probable cause is a fluid concept—turning on the assessment of probabilities in particular contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id*. at 232.

¶ 25     In reviewing the propriety of an arrest, courts must consider the totality of the circumstances and the facts known to the police at the time of the arrest, and review should not be tainted by hindsight. *People v. Aguilar*, 286 Ill. App. 3d 493, 496 (1997). The facts known to the officer at the time of arrest must be sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime. *Hopkins*, 235 Ill. 2d at 472. The analysis requires an objective evaluation of the police conduct and does not hinge upon the subjective perception of the officer. *People v. Luedemann*, 222 Ill. 2d 530, 551 (2006).

¶ 26     Defendant was arrested on April 11, 2015, after *People v. Aguilar*, 2013 IL 112116, was decided. There, our supreme court struck down as unconstitutional the section of the AUUW that categorically banned the possession of an operable firearm outside the home. *Id*. ¶¶ 20-22. In so holding, the court noted that in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the United States Supreme Court signaled that "the second amendment right to keep and bear arms extends beyond the home." *Aguilar*, 2013 IL 112116, ¶ 20. It also noted the *Heller* court's statement that individual self-defense was "the central component" of the second amendment. Explicitly relying on and adopting the Seventh Circuit's reasoning in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), our supreme court stated that it would "make little sense to restrict that right to the home" because "confrontations are not limited to the home." *Aguilar*, 2013 IL 112116, ¶ 20 (quoting *Heller*, 554 U.S. at 592). The court in *Aguilar* made clear, however, that the right to possess a firearm for self-defense outside the home is not unlimited, and it is subject to meaningful regulation. *Id*. ¶ 21. The FOID Card Act and

Firearm Concealed Carry Act are examples of such meaningful regulation, and defendant in the instant matter was convicted of violating both acts. Nevertheless, on the date of defendant's arrest, possession of a firearm outside the home was not, in and of itself, a crime. It therefore follows that the mere observance of a firearm on an individual's person, without more, is insufficient to establish probable cause. Indeed, the State concedes in its brief that "there is nothing inherently criminal in possessing a firearm." As the First District recently observed, "under the current legal landscape, police cannot simply assume a person who possesses a firearm outside the home is involved in criminal activity." *People v. Markeese Thomas*, 2019 IL App (1st) 170474, ¶ 40.

¶ 27    We agree with defendant that his arrest was unsupported by probable cause because the totality of the facts and circumstances known to the officers at the time of defendant's arrest, as established by their trial testimony, did not suggest that defendant had committed or was committing a crime. Officers Ramirez and Lynch initially approached the stopped vehicle defendant was seated in because the woman in the driver's seat, Luellen, had called 911 regarding a "potential stolen vehicle." No mention of a firearm was made in the dispatch. Officer Ramirez arrived at the scene while Officer Lynch was speaking with Luellen, and he noted that someone was in the front passenger seat of the vehicle. He approached the passenger side, shined his flashlight into the car, knocked on the passenger-side window, and told defendant to roll it down. In compliance with the instruction, defendant rolled down the window and, in doing so, Officer Ramirez saw the black handle of a "possible firearm" sticking out from the right pocket of the jacket defendant was wearing. Officer Ramirez immediately drew his sidearm, held defendant at gunpoint, and had defendant put his hands out the window. Once Officer Lynch was free to assist, Officer Ramirez ordered defendant to exit the car and placed him in handcuffs while Officer Lynch seized the firearm. Defendant was then put in the backseat of Officer Lynch's squad car and

transported to the Elgin police station. These actions plainly constituted an arrest or seizure under the fourth amendment. See *People v Reed*, 298 Ill. App. 3d 285, 298 (1998) (noting that "[a]n arrest occurs when a person's freedom of movement has been restrained by means of physical force or show of authority"), and *People v. Wallace*, 299 Ill. App. 3d 9, 17 (1998) ("[t]he test for determining whether a suspect has been arrested is whether, in light of the surrounding circumstances, a reasonable, innocent person would have considered himself free to leave").

¶ 28    Defendant asserts that officer Ramirez did not ask him any questions to ascertain whether or not his possession of the firearm was lawful, but instead immediately drew his own firearm, ordered defendant out of the car, handcuffed him, placed him in a squad car, and drove him to the police station, thus completing the arrest. He points out that both officers testified that they had no knowledge regarding whether defendant legally possessed the firearm at the time of the arrest, and the State does not dispute defendant's characterization of the officers' testimony in its brief. The following exchange occurred at trial during Officer Ramirez's testimony:

"Q. [By defense counsel]: Officer Ramirez, that the [*sic*] point you have no knowledge whether Mr. Ramirez [*sic*] has [a] FOID card or not?

A. [Officer Ramirez]: I did not have any knowledge whether Mr. Hatch had a FOID card or not.

Q. And you did not have any knowledge whether Mr. Hatch legally possessed the gun or not, correct?

A. I did not."

Officer Lynch similarly testified, as follows:

"Q. [By defense counsel]: At the time, you did not have any knowledge whether Mr. Hatch, the passenger, legally was—has that gun, correct?

A. [Officer Lynch]: Correct.

Q. And as an officer, you're aware that citizens have second amendment rights, correct?

A. Correct.

\*\*\*

Q. So, [a] citizen can have a gun in their car, correct?

A. Correct."

¶ 29 The record demonstrates that defendant was immediately arrested solely upon the officers' observation that he was in possession of a firearm outside the home which, in the wake of *Aguilar*, is not *per se* unlawful. Indeed, the Firearm Concealed Carry Act, which was in effect at the time of defendant's arrest, specifically allows a license holder to "keep or carry a loaded or unloaded firearm on or about his or her person within a vehicle." 430 ILCS 66/10(c)(2) (West 2014). Moreover, nothing in defendant's conduct during his interaction with the officers gave rise to probable cause or suggested that defendant may have possessed the firearm illegally because both officers testified that defendant fully complied with all their commands. *Cf. Markeese Thomas*, 2019 IL App (1st) 170474, ¶¶ 34, 38 (police, who were patrolling the area due to recent gang activity, had probable cause to believe the defendant illegally possessed a gun where, upon seeing the officers, he handed the gun he was holding to his friend, and immediately fled into an upstairs apartment unit and locked the door); *People v. Lawrence*, 2018 IL App (1st) 161267, ¶ 44 (police had probable cause to believe the defendant did not have a FOID card because he gave a false exculpatory statement when he stated the gun was not a gun, but a lighter); *People v. Hood*, 2019 IL App (1st) 162194, ¶ 73 (police had probable cause to arrest where, as an officer approached,

the defendant put a gun in a black plastic bag and threw it into the backseat of the car, and he later admitted he did not have a concealed carry license.

¶ 30    Glaringly absent from the State's brief is *any* argument that the police had probable cause to arrest defendant.  Except for the possession of the gun itself, the State identifies no facts or circumstances that were known to the officers at the time of the arrest that could give rise to probable cause to believe defendant's possession of the gun was unlawful or that he had committed or was about to commit a crime.  Instead, the State maintains that the actions of the police officers—including their arrest of defendant—were "completely lawful and justified" because the officers had a reasonable apprehension of danger when they saw a firearm in defendant's front jacket pocket.  The State relies exclusively on a pre-*Aguilar* case, *Colyar*, 2013 IL 111835, which it asserts "controls the outcome of this case."

¶ 31    In *Colyar*, two police officers approached a vehicle containing three individuals that was parked in a motel parking lot entrance.  *Id.* ¶¶ 6-8.  One of the officers asked the driver, Colyar, why he was blocking the entrance, and he replied that he was picking someone up.  *Id*. ¶ 8.  The other officer shined his flashlight into the car and saw a plastic bag containing a bullet.  *Id*.  They ordered the occupants out of the car, handcuffed them, and recovered the plastic bag, which contained five rounds of ammunition.  *Id*. ¶ 9.  The officers frisked the individuals and found an additional bullet in defendant's pocket.  Believing there might be a gun inside the car, the officers searched it and found a revolver under a floor mat.  *Id*. ¶ 10.  Colyar was charged with multiple weapons offenses.  *Id*. ¶ 4.

¶ 32    A majority of the appellate court affirmed the trial court's ruling to suppress the evidence, reasoning that the police subjected Colyar to an unlawful search without probable cause because the bullet did not establish evidence of a crime.  *Id*. ¶¶ 2, 19.  The majority construed the State's

position as being that the officers had probable cause and thus the search of the vehicle was a lawful search incident to arrest (*id*. ¶ 17), while acknowledging that the State may have intended to argue that the search was premised on reasonable suspicion under *Terry*, rather than on probable cause (*id*. ¶ 18).

¶ 33    On review, our supreme court determined, as a preliminary matter, that the State did not forfeit its arguments related to *Terry* (*id*. ¶ 27), and it noted that both parties agreed that the police conduct at issue was initiated as a proper *Terry* stop (*id*. ¶¶ 1, 41).  It then turned to the merits to analyze whether, after seeing a bullet on the center console, the officers' actions were justified under *Terry*.  *Colyar*, 2013 IL 111835, ¶¶ 41, 53.  It noted that the *Terry* court held that "a brief investigatory stop, even in the absence of probable cause, is reasonable and lawful under the fourth amendment when a totality of the circumstances reasonably lead the officer to conclude that criminal activity may be afoot and the subject is armed and dangerous."  *Id*. ¶ 32.  Our supreme court also noted that *Terry* allows for a reasonable search for weapons (*id*. ¶ 35), and that *Terry* was extended to permit a protective search of the passenger compartment of a vehicle during an investigatory stop in *Michigan v. Long*, 463 U.S. 1032 (1983) (*Colyar*, 2013 IL 111835, ¶ 38).

¶ 34    The *Colyar* court concluded, consistent with *Terry* and *Long*, that the defendant's fourth amendment rights were not violated by the officers' conduct of ordering him out of the car, handcuffing and searching him, and searching the vehicle in a protective sweep, because they had a reasonable suspicion that a gun was present that threatened their safety.  *Id*. ¶¶ 41, 52.  It therefore reversed the suppression of the bullets and firearm, noting that under *Terry*, weapons seized in a protective search during a *Terry* stop are admissible.  *Id*. ¶ 52.  In so ruling, the court rejected Colyar's argument that the officers were required to ask him whether he possessed a FOID card before ordering him out of the vehicle and searching them.  According to the court, the argument

"ignore[d] *Terry's* clear instruction that 'a perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody for the purpose of prosecuting him for a crime.' " *Id.* ¶ 50 (quoting *Terry*, 392 U.S. at 26-27). In any event, the court noted that the officers could have feared for their safety even if Colyar possessed a FOID card because the risk "posed by a potentially armed individual is not always eliminated simply because the weapon is possessed legally." *Id.* ¶ 51.

¶ 35    *Colyar* does not support the State's argument for two reasons. First, the actions of the officers in *Colyar* occurred during a proper *Terry* stop and, in the *Colyar* majority's view, the parties agreed the initial encounter between the defendant and the officers was lawful. *Id.* ¶¶ 1, 41. Here, not only does the State fail to argue in its brief that defendant's arrest was supported by probable cause, it does not even argue that the officers' initial interaction with defendant began as a lawful *Terry* stop. Instead, it suggests that the officers' initial approach to the vehicle may be "analyzed under a consensual encounter or a *Terry*-like investigation," but then fails to effectively do either. Defendant asserts that "there was no valid *Terry* stop in this case. Instead, the incident went straight from a consensual encounter to a full-blown arrest." We agree. At trial, Officer Lynch testified he did not see any suspicious acts being committed as he walked up to the vehicle. The State acknowledges in its brief that "the officers approached the car defendant was in for a benign reason." Thus, it effectively concedes that the initial encounter between the officers and the vehicle's occupants was consensual in nature, rather than a *Terry* stop. The fourth amendment was not implicated in the initial encounter because it involved neither coercion nor detention. See *Gherna*, 203 Ill. 2d at 177. Moreover, Officer Lynch's testimony confirms that he approached the vehicle because he believed the individual in the driver's seat, Luellen, had placed the 911 call, and she was the one he needed to contact. Nothing in his testimony suggests that he approached

the vehicle because he believed that either Luellen or defendant had committed or was about to commit a crime. To the extent that the State perhaps could have, but did not, argue in its brief that the encounter elevated to a lawful *Terry* stop upon the officers' observation of the firearm, we find the argument forfeited.

¶ 36 Arguendo, even if the initial encounter began as a valid *Terry* stop in the instant matter, *Colyar* does not stand for the proposition that an officer's reasonable apprehension of danger, without more, is sufficient to provide probable cause to make an arrest.[2] The State's argument impermissibly conflates the concept of taking reasonable measures to ensure officer safety during a valid *Terry* stop with probable cause to arrest an individual. *Colyar* demonstrates that these concepts are distinct, as it noted that "a perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody for the purpose of prosecuting him for a crime. [Citation.] The focus in *Terry* on protective weapon searches is the officer's reasonable belief that his safety or the safety of others is in danger, *regardless* of whether probable cause exists to arrest for a crime." (Emphasis in original.) *Colyar*, 2013 IL 111835, ¶ 50 (citing *Terry*, 392 U.S. at 27).

---

[2] We observe that *Colyar* arguably would have supported the police officers' actions in the instant matter prior to defendant's arrest in the context of a valid *Terry* stop. See *Colyar*, 2013 IL 111835, ¶¶ 46-47 (finding that handcuffing during a *Terry* stop is permitted where reasonable and necessary depending on the circumstances of each case, and it does not automatically transform a *Terry* stop into an illegal arrest).

¶ 37    For this reason, the State's reliance on the damaged windshield is misplaced.[3] The damage, if there was any, would arguably have given the officers reasonable suspicion to investigate. It would not have added anything to a probable cause determination unless the officers had observed its causation or had reason to believe that it had recently been caused by a bullet. In any event, the State argues only that the damaged windshield supported the concern the officers had for their safety—it makes no argument in its brief that the damage formed the basis of a *Terry* stop or supported probable cause to arrest defendant.

¶ 38    After briefing was completed but before oral argument was held, the State moved to cite additional authority, *People v. Burns*, 2020 IL App (3d) 170103, which we granted. It argued that *Burns* was relevant to the issues of whether police may search a suspect for a weapon when they are concerned for their safety and whether a suspect is considered arrested when the suspect is placed in handcuffs and searched during a *Terry* stop. *Burns* does not aid the State's case, as no one disputes that officers may take reasonable steps to protect themselves upon observing a firearm during a *Terry* stop without first having to investigate whether defendant lawfully possessed said

---

[3] We note that there was no testimony that the windshield was damaged, and the photographic exhibits of the vehicle admitted at trial during the officers' testimony do not depict the windshield. The basis for the State's reference to windshield damage appears to be a motion *in limine* filed by defendant, wherein he sought to exclude any testimony or evidence concerning the damage. He asserted that the police report stated, according to Luellen, both that the vehicle had been shot at the prior evening in Chicago and that the damage was caused by a rock hitting it. Although the circuit court denied the motion *in limine*, no reference to a damaged windshield was made at trial.

firearm. Once officer safety was ensured, however, *some* amount of investigation was required of the officers to establish probable cause for an arrest. Here, there was none. To the extent the State relied on *Burns* at oral argument to argue that the inevitable discovery and good faith exceptions should apply, we find these arguments forfeited because it failed to raise them in its brief.

¶ 39    This leads us to the second reason *Colyar* does not support the State's position—it predates *Aguilar* which, as we noted above, struck down a section of the AUUW statute that categorically prohibited the possession of an operable firearm outside the home. In *Colyar*, once the police officers confirmed that the defendant had an operable firearm in his vehicle, that evidence, alone, was sufficient to establish the probable cause needed to effectuate a lawful arrest based on their belief that the defendant illegally possessed a gun. See *People v. James Thomas*, 2019 IL App (1st) 162791, ¶ 22. In the instant matter, because defendant was arrested after *Aguilar* was decided, the officers needed probable cause to believe that his possession of a firearm was illegal; the fact that the officers observed a firearm in defendant's jacket pocket, without more, was insufficient. As the First District recently observed in *James Thomas*, "[p]ost-Aguilar, the mere possession of a gun in a car could be concealed carry, which would be illegal only if defendant did not have a FOID card." *Id*. Like in *James Thomas*, the police officers here did not know whether defendant legally possessed the gun at the time they arrested him. See also *People v. Spain*, 2019 IL App (1st) 163184, ¶ 37 (noting that police needed probable cause to believe not only that the defendant was carrying a gun, but that he did so illegally); *Markeese Thomas*, 2019 IL App (1st) 170474, ¶ 40 (stating that police "cannot use a firearm in partial view, such as a semi-exposed gun protruding from the pant pocket of a person on a public street, alone as probable cause to arrest an individual for illegal possession without first identifying whether the individual has the necessary licenses. We thus caution against the 'arrest first, determine licensure later' method of police

patrol"). Here, the State's position amounts to an "arrest first, determine licensure later" method of policing that has been repeatedly rejected. See *Spain*, 2019 IL App (1st) 163184, ¶ 42; and *Markeese Thomas*, 2019 IL App (1st) 170474, ¶ 40. "When officers arrest someone found in possession of a gun without first asking whether he or she is legally entitled to be carrying that gun, the police are at significant risk that they are arresting a suspect without the requisite probable cause, such that any fruits of that arrest will be inadmissible in a criminal prosecution." *Spain*, 2019 IL App (1st) 163183, ¶ 42. Such is the case here, and a motion to quash arrest and suppress evidence would have been meritorious, in that it would have succeeded, had defendant's trial counsel filed it.

¶ 40      We also agree with defendant that there is a reasonable probability that the outcome of the trial would have been different without the challenged evidence. Again, a reasonable probability that the trial outcome would have been different occurs when the "probability is sufficient to undermine confidence in the outcome." *Simpson*, 2015 IL 116512, ¶ 35. Defendant maintains that "the State cannot obtain a conviction in the absence of the firearm and [defendant's] statements" to officer Lynch in the back of his squad car. The State does not dispute defendant's assertion that the trial outcome would have been different had a motion to quash arrest and suppress evidence been granted, and it is evident that without the firearm recovered from defendant's person, the State could not have presented a case against him for AUUW. The seizure during which the officers recovered the evidence lacked probable cause and, as a result, the firearm and defendant's statements would have been suppressed as fruit of the poisonous tree had trial counsel filed the appropriate motion, and counsel's failure to do so plainly was not sound trial strategy.

¶ 41      Because the State cannot obtain a conviction without the suppressed evidence, the appropriate remedy is outright reversal of both of defendant's convictions. *People v. Harris*, 2015

IL App (1st) 132162, ¶ 47. See also *People v. Leigh*, 341 Ill. App. 3d 492, 497 (2003) (reversing outright the defendant's conviction for unlawful possession of a weapon by a felon because the State could not prevail on remand without the suppressed firearm).

¶ 42                                III. CONCLUSION

¶ 43     For the above-stated reasons, we reverse defendant's convictions for AUUW and need not remand for further proceedings.

¶ 44     Reversed.